**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

_____

| | | |
|---|---|---|
| IN RE: PELLA CORPORATION | : | MDL Docket No. 2514 |
| ARCHITECT AND DESIGNER SERIES | : | THIS DOCUMENT RELATES TO |
| WINDOWS MARKETING, SALES | : | ALL ACTIONS |
| PRACTICES AND PRODUCTS LIABILITY | : | |
| LITIGATION | : | |

_____

## PELLA CORPORATION'S RESPONSE TO PLAINTIFFS' MOTION TO COMPEL

Plaintiffs' Motion to Compel fails for a number of reasons. First, the Plaintiffs' Steering Committee ("PSC") neither conducted nor invited any "meet and confer" conference as to the scope of production for the majority of documents now sought in the Plaintiffs' Motion to Compel. Second, the PSC filed its Motion to Compel over a week after the discovery production deadline passed.[1] Third, but for two categories of documents identified in the Motion to Compel (ProLine documents and sales data), the PSC never expressed *any* objection to Pella's position on production of the same until it filed the current Motion. Finally, despite representing to the Court that Plaintiffs need more time to review documents already produced, and after Pella has spent now nearly $1.1M and produced over 85 gigabytes of data relating to Architect Series and Designer Series windows, the PSC seeks to expand the discovery to include Pella's ProLine Series windows that are not even subject of the MDL. While there are many perplexing elements about Plaintiffs' motion to compel, one thing is clear: there is nothing the PSC now seeks that will make one bit of difference in its bid to certify a class or classes in the MDL. The

_____

[1] The PSC also filed a motion to extend the deadline for discovery and to amend CMO-5 on January 15, 2015. ECF Doc. 63. Despite now seeking additional documents, some for the first time in its Motion to Compel, the PSC has nowhere requested that the January 15, 2015 document production deadline be extended. *See* ECF Doc. 63-3.

US.55664010.03

PSC should not be allowed to prolong the course of this litigation to a certification decision over alleged discovery "deficiencies" that do not exist.

Pella made every attempt to avoid a late discovery dispute of the type in which it now finds itself.  Pella provided painstakingly specific objections and responses to Plaintiffs' Master Set of Discovery Requests, painstakingly specific service letters, painstakingly specific explanations in 30(b)(6) depositions of what it produced and how.  In less than eight months, Pella produced upwards of 480,000 Bates numbered pages and 94,000 native files, in satisfaction of its obligations under the Federal Rules of Civil Procedure, and in a timely manner pursuant to Amended CMO-5 (ECF Doc. 51).  Despite all of this, the PSC now moves to compel discovery on (1) products not at issue in this MDL litigation; (2) voluminous hardcopy documents containing customer service and sales information when customer service sources more reasonably accessible and less burdensome to collect have already been produced, (3) privileged information properly redacted; and (4) the custodial files of every individual who works at Pella despite having agreed on a custodial file protocol seven months ago.[2]  The PSC's argument for the same is overreaching and not justified under the law.  The Plaintiffs' Motion to Compel should be denied in its entirety.

## BACKGROUND

***Background Regarding Plaintiffs' Discovery Requests***

On June 17, 2014, the Court issued Case Management Order No. 5 ("CMO-5"), setting specified deadlines for the conduct of discovery and other matters in the MDL.  *See* ECF Doc. 21. In pertinent part, the Court ordered that all initial written discovery be served by June 6,

---

[2] The PSC also purports to seek the production of the custodial file of an employee of Pella's Chicago distributor, Kathy McGuine, requested through a subpoena served on Ms. McGuine on January 12, 2015, just 4 days before Ms. McGuine's deposition.  However, the PSC fails to brief the issue at all in Plaintiffs' Motion to Compel.

US.55664010.03

2014; that the parties agree on proposed custodians for the production of email and other custodial data, as well as search terms, by June 15, 2014; and that documents be produced in response to discovery requests on a rolling basis, to be completed by November 7, 2014. *Id.* ¶¶ 2, 3, 5. At the PSC's request, the document production deadline was later extended to January 15, 2015. ECF Doc. 51 ¶ 5. Pursuant to Case Management Order Nos. 2 and 3, each party was entitled to request 50 interrogatories (including subparts), 50 requests for production (including subparts), and 30 custodial files. *See* ECF Doc. 27 § III(A) (CMO-2); ECF Doc. 20 § I(D) (CMO-3). The Plaintiffs served Plaintiffs' Master Set of Discovery Requests ("Requests") on June 9, 2014. *See* Ex. 1 (Plaintiffs' Master Set of Discovery Requests). Plaintiffs' Requests, including subparts, exceeded the permissible number of both interrogatories and requests for production under CMO-3. *See id.*

### Background Regarding Pella's Discovery Responses

Pella responded to Plaintiffs' Requests on July 31, 2014, serving its Objections and Responses to Plaintiffs' Master Set of Discovery Requests ("Responses"). *See* ECF Doc. 64-2.[3] In these written Responses, which spanned more than 60 pages, Pella provided extensive responses and detailed objections to every one of the Plaintiffs' voluminous discovery requests, in compliance with the Federal Rules of Civil Procedure, the Local Rules of the District of South Carolina, and the Case Management Orders governing this litigation. Indeed, for every one of the Plaintiffs' requests for production, Pella specified its objections, and outlined specifically the sources it intended to produce in response to the request.

For requests that Pella objected to in their entirety, Pella made that clear. For example, with regard to Plaintiffs' request for all documents exchanged in the *Saltzman* litigation (Request

---

[3] The parties agreed to a mutual extension of time – to July 31, 2014 – to respond to the master discovery requests.

US.55664010.03

No. 7), Pella unambiguously objected because the *Saltzman* case involved ProLine windows, a separate and distinct product not at issue in the MDL and because a Confidentiality Order exists in that case that Pella is not willing to release.  *See* ECF Doc. 64-2 at 47; ECF Doc. 64-3 (Email from J. Mandler to H. Segui dated October 14, 2014).

For certain requests, Pella objected in part but agreed to produce a more limited amount of data than was sought in Plaintiffs' Requests.  For example, with regard to the Plaintiffs' request for *all* customer service and warranty documents (Request Nos. 21, 22, 31), Pella agreed to produce records from Pella's current and legacy customer service and warranty databases (five different sources in all), but "object[ed] to producing customer service or field records that are maintained in hard copy files and neither categorized as to product, service or claim type, nor related to Named Plaintiffs, whether located at Pella corporate or Pella branches, as unduly burdensome to collect, review and produce and therefore not reasonably accessible under Rule 34."  ECF Doc. 64-2 at 57, 60.  Moreover, Pella noted that "[t]he customer service data Pella is producing from more reasonably accessible sources is comprehensive and adequate."  *Id.* Likewise, with regard to the Plaintiffs' request for *all* sales data relating to Architect Series and Designer Series windows, Pella objected but stated that it would produce "unit sales information by branch, corporate direct, or national account by year" back to 1997 and bookings data by year prior to 1997.  *See* ECF Doc. 64-2 at 11, 58, 62.  Pella produced that data on September 12, 2014.  *See* ECF Doc. 65-2.

On October 23, 2014, nearly three months after the Plaintiffs received Pella's Responses, Plaintiffs' counsel and PSC member Andrew Lemmon sent a letter to Pella counsel identifying "some specific topics and themes" the PSC contended to be deficient in Pella's written Responses.  *See* ECF Doc. 65-7 (Letter from A. Lemmon to J. Mandler dated October 23, 2014).

4

Although this letter represented the PSC's first written communication identifying alleged deficiencies in Pella's Responses, Mr. Lemmon clarified: "this letter is a preliminary overview, which does not address the adequacy of document production (with the exception of any documents withheld due to improper objections or limitations), nor provides a specific accounting of the incompleteness or insufficiency of each and every written response."  *Id.* at 1.

Pella responded to this letter on November 5, 2014.  *See* ECF Doc. 65-8 (Letter from A. Fiterman to A. Lemmon dated November 5, 2014).  Among other issues addressed, Pella reiterated and explained its objection to producing documents from the *Saltzman* litigation and related to ProLine windows:

> [T]he only products at issue in this litigation are Architect Series and Designer Series windows.  ProLine windows, vinyl windows, fiberglass windows, and doors of any Series or type are not a subject of this MDL, and Pella objects to producing documents pertaining to such non-relevant products. Plaintiffs are already requesting, and receiving, voluminous documents and information regarding every type and design of Architect Series and Designer Series windows ever manufactured by Pella. This will provide more than sufficient discovery to litigate the claims in this litigation. Pella stands by its objection that requests for non-relevant product discovery is overly broad and not reasonably calculated to lead to the discovery of admissible evidence. That said, Pella also states that it has not redacted information relating to products other than Architect and Designer Series windows that may exist in documents otherwise relevant to Architect and Designer Series windows.

*Id.*

Between November 25, 2014 and December 8, 2014, Pella received three different response letters, from three different members of the PSC, regarding mostly overlapping issues purportedly maintained with regard Pella's Responses.  *See* ECF Doc. 65-9 (Letter from A. Lemmon to J. Mandler dated November 25, 2014); ECF Doc. 65-10 (Letter from D. Bryson to J. Mandler dated December 1, 2014); ECF Doc. 65-11 (Letter from D. Wise to J. Mandler dated

5

December 8, 2014). Following these letters, on December 9, 2014, the parties held a meet and confer teleconference where a number of discovery issues were addressed. On December 10, 2014, Pella memorialized the substance of the parties' discussions the day before, and formally responded to the issues raised in the PSC's three letters. *See* ECF Doc. 65-12 (Letter from A. Fiterman to D. Bryson et al. dated December 10, 2014).

***Background Regarding Pella's Document Production***

Pella began producing documents in this litigation on June 6, 2014, before it even received Plaintiffs' Requests. *See* Ex.2 ¶ 3 (Declaration of A. Fiterman). Since that time, Pella and its counsel have been diligently engaged in the collection, processing, review, and production of the sources Pella committed to produce, as well as sources (not identified in Pella's written Responses) that Pella agreed to produce following discussions with the PSC. With limited exception,[4] Pella completed its document production on January 15, 2015. *Id.* ¶ 4. To date, Pella has produced approximately 481,726 of Bates numbered pages, approximately 94,619 native files, for a grand total of approximately 85.87 gigabytes of data. The chart filed at ECF Doc. 65-2 identifies the sources Pella has produced, the total number of documents and pages Pella produced from each, and the date(s) on which Pella produced them.[5] The cost to Pella for the review and production of these documents has now exceeded $1.1 million. *Id.* ¶ 7.[6]

---

[4] Pella has made six supplemental productions totaling 148 pages since January 15, to produce responsive non-privileged materials identified by Pella after the close of discovery. In addition, as discussed in further detail below, Pella recently agreed to supplement its production of R&A data, customer service data, and plant testing and quality data. Pella is in the process of extracting this data from the relevant sources.

[5] In an effort to bolster its concurrently filed Motion to Extend the Deadlines for Discovery (ECF Doc. 63), the PSC suggests that Pella produced a disproportionate numbers of documents in December and January, leading up to the document production deadline, *see* ECF Doc. 64 at 2-3 (Pfs.' Mem.). In fact, the vast majority of documents produced in this timeframe were custodial files, and were produced in December and January not because of any delay by Pella, but rather

***Background Regarding Plaintiffs' Current Motion***

On January 23, 2015, the PSC filed the instant motion to compel, which purports to seek a Court order requiring the production of the following materials:

- Documents exchanged in the *Saltzman* litigation related to ProLine windows;

- Customer service and warranty documents above and beyond the voluminous and comprehensive data already produced from Pella's current and legacy customer service and warranty databases;

- Sales data above and beyond the comprehensive sales data already produced from Pella's data warehouse and legacy bookings data;

- Pricing information;

- Unredacted copies of documents the PSC falsely alleges were improperly redacted;[7] and

- Additional custodial files, above and beyond the 30 permitted by CMO-2.

*See generally* ECF Doc. 64 (Pfs.' Mem.).  In addition to the above categories, the PSC also purports – in the introduction and conclusion to its opening memorandum – to move for the compelled production of the "McGuine subpoenaed documents."  *Id.* at 1, 24.  However, nowhere in the bodies of Plaintiffs' Motion to Compel or their Memorandum in support of the same address the "McGuine subpoenaed documents," and nowhere does the PSC specify the scope of "subpoenaed documents" it seeks to compel.

---

as a result of the *PSC's own delay* in identifying custodians.  *See* ECF Doc. 65 (Pella Corp.'s Mem. in Opp. to Pfs.' Mot. for Extension and Proposed Sec. Am. CMO-5 Sched. Order).
[6] This figure does not include attorney fees related to document collection, processing, review and production, other than the cost of contract attorneys for document review.  Ex. 2 ¶ 6.
[7] As discussed below, Pella did not redact any documents on responsiveness grounds, and all of the partially redacted documents identified in Plaintiffs' Motion to Compel were redacted for attorney client privilege.  Pella's redactions were logged appropriately in privilege logs consistent with the requirements of CMO-4, and the PSC was in possession of most of the applicable privilege logs weeks before it filed its motion.

## STANDARD

Pursuant to Fed. R. Civ. P. 37, a party seeking discovery may move for an order compelling production where the opposing party "fails to respond that inspection will be permitted – or fails to permit inspection – as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B)(iv). In the District of South Carolina, motions to compel must be filed "within twenty-one (21) days after receipt of the discovery response to which the motion to compel is directed . . . ." L.R. 37.01(a). Moreover, to avoid unnecessary motion practice, the moving party must "meet and confer before contacting the Court on discovery issues," CMO-3 § I(J) (ECF Doc. 20), and must include a certification with the motion "that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1); L.R.7.02. Failure to file within the time period allowed, and failure to meet and confer in advance of filing, are both grounds for the Court to deny a motion to compel. *See, e.g.*, *Johnson v. County of Horry*, No. 09-1758, 2012 U.S. Dist. LEXIS 62571, *2-4 (D.S.C. May 4, 2012) (denying motion to compel as untimely under L.R. 37.01(a)); *Melton v. Carolina Power & Light Co.*, No. 11-00270, 2012 U.S. Dist. LEXIS 133540, *10-11 (D.S.C. Sept. 19, 2012) (denying Rule 37 motion in part because it was filed outside the time prescribed by L.R 37.01(a)); *Hager v. Graham*, 267 F.R.D. 486, 491 (N.D. W. Va. 2010) ("The failure to follow the requirement to confer, or attempt to confer, is grounds for the court to deny the motion to compel."); *Ambu, Inc. v. Kohlbrat & Bunz Corp.*, No. 99-20, 2000 U.S. Dist. LEXIS 241, at *6 (W.D.N.C. Jan. 6, 2000) ("[T]he fact that Defendants did not confer with opposing counsel and attempt to resolve this dispute before filing the motion to compel is sufficient reason to deny the motion.").

For motions to compel that are properly filed, the movant must set forth in the motion "the grounds for the motion, including a statement explaining why the discovery should be had

8

within the context of the action (where the motion challenges objections) or the relevant dates of service and facts demonstrating noncompliance or supporting a challenge to the sufficiency of the response." L.R. 7.04. In addition, "[r]elevant portions of the discovery material shall be filed with the motion." *Id.*

Although the scope of discovery under the Federal Rules is broad, *see* Fed. R. Civ. P. 26(b)(1), "the simple fact that requested information is discoverable under Rule 26(a) does not mean that discovery must be had." *Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 543 (4th Cir. 2004); *Ingle v. Yelton*, 264 Fed. Appx. 336, 339 (4th Cir. 2008). Indeed, Fed. R. Civ. P. 26(b)(2)(C) defines circumstances where a court must limit discovery, even if the information sought is discoverable under Rule 26(b)(1):

> On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules . . . if it determines that:
>
> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

*See also Nicholas*, 373 F.3d at 543 (affirming district court's denial of additional discovery, finding it was "cumulative and duplicative, unduly burdensome, and harassing."). With regard to the latter of the three reasons to limit discovery – that the burden of the discovery outweighs its benefit – courts must decide by balancing the importance of the discovery sought to the moving party and the cost and burden to the producing party. *Marens v. Carrabba's Italian*

9

*Grill, Inc.*, 196 F.R.D. 35, 37 (D. Md. 2000). "The court is given great flexibility to order only that discovery that is reasonable for a case, and to adjust the timing of discovery and apportion costs and burdens in a way that is fair and reasonable." *Id.*; *see also Morris v. Metals United States*, No. 09-1267, 2011 U.S. Dist. LEXIS 3057, *7 (D.S.C. Jan. 11, 2011) ("The scope and conduct of discovery . . . are within the sound discretion of the district court.") (Norton, J.).

## ARGUMENT

The Court should deny Plaintiffs' Motion to Compel in its entirety for the reasons discussed below.

### I.    The Court Should Deny Plaintiffs' Motion in its Entirety as Untimely.

As an initial matter, the Court should deny the Plaintiffs' Motion in its entirety because they did not file it within the period of time prescribed by Local Civil Rule 37.01(a). This rule provides that "[m]otions to compel discovery must be filed within twenty-one (21) days after receipt of the discovery response to which the motion to compel is directed . . . ."

Here, Pella served its written Responses upon Plaintiffs on July 31, 2014. In these Responses, Pella expressly objected to producing ProLine documents, *see* Responses at 1, 47; objected to producing hard copy customer service and field records, *see id.* at 57, 60; and stated unambiguously how it intended to produce the customer service, warranty, and sales data requested by Plaintiffs, *see id.* at 57, 58, 60, 61-62. Although the PSC received these objections and responses on July 31, it did not identify any purported deficiencies until October 23, nearly three months later, and only two weeks prior to Pella's then-deadline for document production. Even then, the PSC addressed only "some specific topics and themes" it contended to be deficient. And, despite serving now five different deficiency letters on Pella, the PSC *never*

US.55664010.03

objected to Pella's position on the production of hard copy customer service files, pricing data,[8] or employee custodial files (including those of Kathy McGuine) until it filed the present Motion to Compel. If these documents were so important to the PSC's case, why were they never addressed before? Pella has no option other than to believe that the PSC's eleventh hour (arguably twelfth hour) motion is nothing more than an attempt to manufacture the appearance of discovery issues that, it says, require more time to address; and to increase the costs and burden of document production to pressure Pella into settlement. The Court should not condone such behavior.

Pella's document production is now virtually complete. The Court should not permit the Plaintiffs to delay this litigation any further, and should deny Plaintiffs' Motion to Compel as untimely. *See* L.R. 37.01(a); *Johnson*, 2012 U.S. Dist. LEXIS 62571 at *2-4 (denying motion to compel as untimely under L.R. 37.01(a)); *Melton*, 2012 U.S. Dist. LEXIS 133540 at *10-11 (denying Rule 37 motion in part because it was filed outside the time prescribed by L.R 37.01(a)).

## II.    The Court Should Alternatively Deny Plaintiffs' Motion on Other Grounds.

### A.    The Court Should Deny Plaintiffs' Motion to Compel ProLine Documents from the *Saltzman* Litigation Because ProLine Windows Are Different Products Involving Different Issues.

The PSC's demand for ProLine documents stems from its request for *Saltzman* documents in Request for Production No. 7. This request seeks: "copies of any and all pleadings, depositions, affidavits, transcripts, recordings, reports, and documents exchanged in the matter Saltzman v. Pella Corporation (Northern District of Illinois, No. 06-4481)." Ex. 1 at

---

[8] In fact, the PSC and Pella reached agreement on a revised production of R&A data that explicitly excluded pricing data and credit/reimbursement amounts. *See* Ex.7 (Email of J. Mandler to J. Lucey dated January 13, 2015); Ex. 8 (Email of J. Lucey to J. Mandler dated January 16, 2015).

47.[9]  On July 31, 2014, Pella objected to this request in its entirety as "overly broad, not

reasonably calculated to lead to the discovery of admissible evidence, and as seeking documents

and information not relevant to Plaintiffs' claims or Pella's defenses. *See* General Objection Nos.

1-2."  *Id.*  General Objection No. 1, expressly incorporated into Pella's response, provided in

pertinent part as follows:

> Pella objects to these Master Requests to the extent they seek
> information or documents pertaining to products, brands, or
> vintages other than Pella® Architect Series and Designer Series
> aluminum-clad wood windows manufactured between 1991 and
> the present – the only products at issue in this litigation. Pella
> objects to Plaintiffs' Master Requests as overly broad and not
> reasonably calculated to lead to the discovery of admissible
> evidence, to the extent they pertain to ProLine Series window
> products . . . .

ECF Doc. 64-2 at 1-2.  The PSC did not take issue with Pella's response to Request No. 7 until

nearly three months later.  *See* ECF Doc. 65-18 (Email from H. Segui to J. Mandler dated

October 24, 2014); ECF Doc. 65-7 (Letter from A. Lemmon to J. Mandler dated October 23,

2014).

The present motion does not seek to compel production of all *Saltzman* documents, but

rather only the *Saltzman* documents that relate to ProLine windows.  *See* ECF Doc. 64 at 5-13.[10]

---

[9] Other than the request for *Saltzman* materials contained in Request No. 7, Plaintiffs did not
request documents related to ProLine windows, or information related to ProLine windows,
anywhere in their First Set of Master Discovery.  *See generally* Ex. 1(Requests); *id.*at 3 (defining
"The Products" as "Pella Architect and Designer Series windows").  Indeed, the word "ProLine"
does not even appear in Plaintiff's discovery requests.  Accordingly, Plaintiffs' Motion to
Compel this category of documents should not be framed – as the PSC has framed it – as a
motion to compel ProLine documents; it should instead be framed as a motion to compel
ProLine documents that were produced in the *Saltzman* litigation.

[10] The PSC's suggestion in its opening memorandum that it is seeking "narrowly focused
discovery of the Proline Series of windows" is false.  *See* ECF Doc. 64 at 1.  Indeed, the express
words of the request belie this contention: "Produce copies of *any and all pleadings, depositions,
affidavits, transcripts, recordings, reports, and documents exchanged* in the [*Saltzman* matter]."

The Court should deny the PSC's request for these materials because, as the J.P.M.L. has on three occasions concluded and as Pella counsel has discussed with the PSC repeatedly, the ProLine component of *Saltzman* involved a completely different product and completely different issues than those implicated in the MDL.

### 1.  Standard

Although courts permit discovery of "similar, if not identical, models" of products, *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380-81 (8th Cir. 1992), "allowing discovery of models that are not substantially similar to the model at issue is truly the equivalent of comparing apples and oranges where there are differences between the other models and the model at issue . . . ." *Hartsock v. Goodyear Dunlop Tires N. Am. LTD*, No. 13-419, 2013 U.S. Dist. LEXIS 183182, *22 (D.S.C. Nov. 22, 2013) (quoting *Piacenti v. Gen. Motors Corp.*, 173 F.R.D. 221, 225 (N.D. Ill. 1997)).  Conclusory generalities are insufficient to establish "substantial similarity." *See, e.g.*, *Gibson v. Ford Motor Co.*, 510 F. Supp.2d 1116, 1121 (N.D. Ga. 2007); *Tolstih v. L.G. Elecs.*, No. 07-582, 2009 U.S. Dist. LEXIS 18573, *16 (S.D. Ohio Feb. 20, 2009).[11]

---

Ex. 1 at 13 (Req. No. 7) (emphasis added).  The request is neither narrow nor focused; it asks for everything.

[11] The Plaintiffs rely upon *United Oil* Co*., Inc. v. Parts Assocs., Inc.*, 227 F.R.D. 404 (D. Md. 2005) (Gauvey, Mag. J.), for the contention that it need not demonstrate identicality or substantial similarity in order to obtain discovery related to ProLine windows.  Numerous courts have held otherwise.  *See, e.g., Barcenas v. Ford Motor Co.*, No. 03-4644, 2004 U.S. Dist. LEXIS 25279, *8 (N.D. Cal. Dec. 9, 2004) ("As the moving party, Plaintiffs bear the burden of establishing that the different products are substantially similar and that the discovery is relevant or reasonably calculated to lead to the discovery of admissible evidence"); *Piacenti v. General Motors*, 173 F.R.D. 221, 225-26 (N.D. Ill. 1997) (requiring movant to file expert affidavit to establish "substantial similarity" and later denying discovery of other products because expert affidavits were conclusory and did not describe why tests performed on other product would be relevant); *Gibson*, 510 F. Supp. 2d at 1119-21; *Steede v. Gen. Motors, LLC*, No. 11-2351, 2013 U.S. Dist. LEXIS 5557, *23-24 (W.D. Tenn. Jan. 11, 2013); *Elec. Ins. Co. v. BrassCraft Mfg. Co.*, No. 10-435, 2012 U.S. Dist. LEXIS 61226, *9-10 (D.N.H. May 2, 2012); *See also Caouette v. OfficeMax, Inc.*, 352 F. Supp. 2d 134, 136 (D.N.H. 2005) ("the party seeking information in discovery over an adversary's objection has the burden of showing its relevance").  Moreover,

**2. ProLine windows are outside the scope of this MDL because they are not "substantially similar."**

On November 19, 2013, (former) plaintiff Gurvinder Pal Singh filed a motion to transfer six putative class action cases – each alleging defects in Pella's Architect Series and Designer Series windows – for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* Plaintiff Gurvinder Pal Singh's Motion for Transfer, MDL No. 2514 (J.P.M.L. ECF Doc. 1).[12] On February 14, 2014, the Panel granted Singh's Motion to Transfer, and assigned the six matters to this Court. *See In re Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Prods. Liab. Litig.*, 996 F. Supp. 2d 1380 (J.P.M.L. 2014). Among other things, the Panel found:

> As mentioned above, all actions share factual issues arising from common allegations that Pella's Architect Series and/or Designer Series aluminum clad windows are defective in that they permit water to enter behind the windows, resulting in premature wood rot and deterioration and causing damage to both the windows and other property. Centralization will eliminate duplicative discovery, prevent inconsistent pretrial rulings (in particular with respect to class certification and Daubert issues), and conserve the resources of the parties, their counsel and the judiciary.

*Id.* at 1382. Since the J.P.M.L. issued its transfer order, 13 additional cases have been transferred to or filed in this Court, and 6 cases have been voluntarily dismissed by Plaintiffs. Presently, a total of 14 cases reside in the MDL.

On August 12, 2014, the J.P.M.L. issued CTO-5 (J.P.M.L. ECF Doc. 81), conditionally transferring the uncertified Architect Series and Designer Series claims of *Eubank, et al. v. Pella*

---

the PSC's reliance upon *United Oil* is additionally misguided because the J.P.M.L. has on three occasions concluded that ProLine claims involve different products and different issues than those implicated in this MDL – thus establishing that ProLine windows are in fact *not* substantially similar.

[12] Following transfer, plaintiff Singh voluntarily dismissed his claims without prejudice in lieu of responding to Pella's Motion to Dismiss.

US.55664010.03

*Corp., et al.*, No. 1:06-4481 (N.D. Ill.) (formerly known as *Saltzman*), to MDL No. 2514 as a

tag-along action.  *See* CTO-5 (Ex. 3).  Simultaneous to this transfer, the Panel separated and

remanded the *Eubank* ProLine Series claims back to the Northern District of Illinois, recognizing

the ProLine claims involved a different product, and therefore different issues, than those in the

MDL:

> It appears that the action on this conditional transfer order involves
> claims relating to: (1) defendant Pella Corporation's Architect and
> Designer Series windows, which involve questions of fact that are
> common to the previously transferred MDL No. 2514 actions; and
> (2) claims with respect to Pella's ProLine Series windows that do
> not involve such common questions of fact.

*Id.*  The J.P.M.L. stayed CTO-5 after the *Eubank* Plaintiffs filed a motion to vacate.  J.P.M.L.

ECF Doc. 106.  The MDL Plaintiffs opposed the motion to vacate, chiefly contending that all the

*Eubank* claims, including those related to ProLine, should be transferred to the MDL.  J.P.M.L.

ECF Docs. 115-16.  The *Eubank* Plaintiffs subsequently withdrew their motion to vacate, and the

J.P.M.L. effected the transfer consistent with CTO-5.  *See* Order Lifting Stay of CTO-5 (Ex.4).

In lifting the stay, the J.P.M.L. transferred the *Eubank* Architect Series and Designer Series

claims to this Court, while separating and remanding to the Northern District of Illinois "[a]ll

claims relating to defendant's ProLine Series windows," which did "not involve common

questions of fact."  *Id.*; Ex. 4 (CTO-5).

       In line with its conclusion that the *Saltzman* ProLine claims involved different products

and different issues than those in the MDL, the J.P.M.L. also declined to transfer the matter of

*Crampton v. Pella Windows & Doors, Inc.*, No. 14-6013 (N.D. Ill.), to the MDL.  Recognizing

that the *Crampton* case involved only ProLine products, the J.P.M.L. issued a Notice to Counsel

indicating that *Crampton* was "not appropriate for inclusion in this MDL. See Rule 7.1(b)(i)."

9/3/2014 Notice to Counsel (Ex. 5).

US.55664010.03

Here, the issue of substantial similarity has already been decided by the J.P.M.L., which on three occasions concluded that the ProLine windows are *different products* involving *different issues* than those implicated in this MDL.  *See* CTO-5; Order Lifting Stay of CTO-5; Notice to Counsel (*Crampton*).  The J.P.M.L. specifically and affirmatively carved out the ProLine claims before transferring the *Saltzman* case to this Court for consolidated proceedings, concluding those claims "do not involve . . . common questions of fact."  Ex. 3 (CTO-5).

### 3. Plaintiffs' counsels' past actions demonstrate that ProLine windows are not "substantially similar."

Plaintiffs' counsels' own actions support the J.P.M.L.'s conclusion.  Although the *Saltzman* litigation originally involved ProLine, Architect Series, and Designer Series windows, the *Saltzman* plaintiffs voluntarily chose to pursue class certification *only* with regard to ProLine casement windows.[13]  Similarly, when the PSC pursued the formation of this MDL, it filed actions and sought to consolidate actions only with regard to Architect Series and Designer Series windows – not ProLine.  If ProLine windows in fact shared "the same or similar design, manufacture, defects, resultant failure modes, and damages as the Architect and Designer Series" as the PSC contends (ECF Doc. 64 at 5), the Plaintiffs' counsel would have not so consistently distinguished ProLine from the other window Series at these critical motion stages.

### 4. Pella has produced comprehensive discovery as to Architect Series and Designer Series windows sufficient to proceed to class certification.

Pella has produced exhaustive discovery in relation to Architect Series and Designer Series windows that will allow Plaintiffs to pursue class certification, and the Court to decide

---

[13] The PSC falsely contends that "[t]hrough settlement, the *Saltzman* case was pared down solely to the Proline Series of windows."  ECF Doc. 64 at 6.  In truth, the *Saltzman* counsel chose voluntarily not to pursue class certification of their Architect Series and Designer Series claims by the deadline set by the court.  They had every opportunity to do so, but instead chose to pursue certification only with regard to ProLine casement windows.

US.55664010.03

whether certification is appropriate. Pella has produced approximately 481,726 Bates Numbered

pages, and approximately 94,619 native files, comprising approximately 85.87 gigabytes of

data;[14] this includes every design drawing in Pella's possession related to every design of

Architect Series and Designer Series window ever made, and will include comprehensive

discovery regarding every warranty claim and customer complaint for Architect or Designer

Series windows Pella has logged in its warranty and/or customer service databases related to a

set of problem codes that has now been agreed to through meet and confer. Pella has generously

provided this discovery, notwithstanding the fact that the Named Plaintiffs in the MDL possess

only a small percentage of the Architect Series and Designer Series window designs that were

the subject of production. However, Pella has drawn the line at the request for ProLine products

because, as the J.P.M.L. has thrice recognized, ProLine windows are different products involving

different issues. The Court should deny Plaintiffs' motion to compel ProLine materials on this

basis.

> **5. The conclusory affidavit of Michael Louis does not compel ProLine production.**

The affidavit of Plaintiffs' expert, Michael J. Louis (ECF Doc. 64-7), does not change

this result. Based on a review of an unspecified number of windows, unspecified types of

windows, and unspecified vintages of windows, using unspecified methodologies, Mr. Louis

purports to conclude that "the inherent design, manufacturing, defects, and resultant damage was

the same or similar throughout all three (3) windows lines." ECF Doc. 64 at 10; ECF Doc. 64-7

---

[14] In contrast, Plaintiffs' counsel Dan Bryson represented to the Court that "extensive discovery was completed" in *In re MI Windows and Doors, Inc., Prods. Liab. Litig.*, MDL No. 2333 (D.S.C.), where MI Windows produced only "38,237 pages, plus native files, a total production in excess of thirty-three (33) gigabytes" Dec. of D. Bryson in Supp. Of Preliminary Approval of Class Action Settlement, *In re MI Windows and Doors, Inc., Prods. Liab. Litig.* (Ex. ___). This amounts to only a fraction of Pella's document production in this litigation.

(Louis Aff.).  But Mr. Louis does not describe why or how he concluded this is the case; rather, he jumps to the conclusion with no analysis.  This type of overgeneralized *ipse dixit* is not sufficient to establish "substantial similarity" for purposes of discovery, particularly given the J.P.M.L.'s repeated conclusion to the contrary.  *See Piacenti*, 173 F.R.D. at 225-26 (denying discovery of other products because expert affidavits were conclusory and did not describe why tests performed on other products would be relevant); *Gibson*, 510 F. Supp.2d at 1119-21 (denying plaintiff discovery of other products because plaintiff's arguments in support of substantial similarity were too generalized); *Tolstih*, 2009 U.S. Dist. LEXIS 18573 at *16 ("Conclusory generalities are insufficient to establish 'substantial similarity.'"); *Steede v. Gen. Motors, LLC*, No. 11-2351, 2013 U.S. Dist. LEXIS 5557, *34 (W.D. Tenn. Jan. 11, 2013) ("Bald assertions without citation to specific evidence and detailed analysis demonstrating substantial similarity do not suffice.").  Here, the Plaintiffs' "generalized supposition is what the substantial similarity standard seeks to avoid."  *Gibson*, 510 F. Supp.2d at 1121.[15]

**6.  The Plaintiffs' reliance upon Pella produced documents does not compel ProLine production.**

Reliance upon certain of Pella's produced documents in an effort to establish "substantial similarity" likewise fails, as discussed below.

The PSC reference to a one-page "E-News" marketing brochure (ECF Doc. 64-1), *see* ECF. Doc. 64 at 5-6, does not establish that ProLine windows are "substantially similar" to Architect Series and Designer Series windows.  As an initial matter, that Pella marketed

---

[15] Significantly, Plaintiffs filed the very same affidavit from Michael Louis in support of their opposition to the *Eubank* Plaintiffs Motion to Vacate CTO-5 in the J.P.M.L.  (J.P.M.L. ECF Doc. 116.)  Despite this affidavit, and despite the MDL Plaintiffs' similar arguments that ProLine windows share common designs and defects with Architect and Designer Series windows made before the Panel (*see* J.P.M.L. ECF Doc. 115), the J.P.M.L. still concluded the ProLine claims involved different products and different issues requiring remand.

different "options" offered by its different wood window Series in a one-page electronic brochure in 2007 does not mean, as the PSC suggests, that the different options listed are the only differences between the different Series of windows.  Such a conclusion cannot be made with regard to the 2007 vintages, and certainly cannot be made with regard to other vintages, to which this "E-News" brochure does not apply.[16]

The contention that certain of Pella's internal documents demonstrate (mostly unspecified) design similarities between ProLine windows and Architect Series and Designer Series windows, *see* ECF Doc. 64 at 10-11, without more, likewise is insufficient to establish "substantial similarity."  Even assuming these documents demonstrate certain design similarities, the PSC has made no showing that the purportedly similar design characteristics matter in the context of this case.  *See Gibson*, 510 F. Supp.2d at 1120 ("The models must share 'pertinent characteristics' as they relate to the accident at issue").  This is not enough to justify ProLine discovery, particularly the context of the J.P.M.L.'s repeated conclusion that ProLine products and claims are different.

The contention that ProLine discovery is warranted because Pella uses the same wood treatment with ProLine that is used with Architect Series and Designer Series products also fails. *See* ECF Doc. 64 at 11-13 (Pfs. Mem.).  Pella has produced documents related to its wood treatment, testing of its wood treatment, and performance of its wood treatment, regardless of whether such documents have related to Architect Series, Designer Series, or ProLine products. In other words, Pella has not withheld wood treatment documents, simply because they related to

---

[16] Moreover, one of the different options listed in the E-News brochure for Architect Series windows – not available with ProLine windows – relates to the wood species options available. *See* ECF Doc. 64-1.  The species of wood used in a window is not an insignificant characteristic, as Plaintiffs suggest, in the context of Plaintiffs' allegations of wood rot and degradation.

19

ProLine windows, and not Architect Series or Designer Series.  Accordingly, Pella has already produced full discovery on wood treatment.

Finally, the PSC cannot rely upon unspecified "other documents" to support its contention of "substantial similarity."  *See Steede*, 2013 U.S. Dist. LEXIS 5557 at *34 ("Bald assertions without citation to specific evidence and detailed analysis demonstrating substantial similarity do not suffice.").

The J.P.M.L. has already concluded, three times over, that ProLine windows are different products involving different issues.  For this and the reasons discussed above, the Court should deny the Plaintiffs' motion to compel production of ProLine materials from the *Saltzman* litigation.

> **7.  Given the lack of "substantial similarity," there is no justification to impose on Pella the cost of producing documents relating to ProLine windows.**

As described in detail above, Pella has already incurred costs in excess of $1.1 million to produce approximately 481,726 of Bates numbered pages, and approximately 94,619 native files relating to the Architect Series and Designer Series windows that are purportedly at issue in this MDL.  Given the lack of substantial similarity described above, the cost and burden on Pella to produce irrelevant documents is not justified.  Moreover, burdensomeness and proportionality always must be considered in both preservation and production of evidence.  *See* Fed. R. Civ. P. 26(b)(2)(c)(iii); *Pippins v. KPMG LLP*, 279 F.R.D. 245, 255 (S.D.N.Y. 2012) (proportionality is necessarily a factor in determining a party's duties to respond to discovery); *Apple Inc. v. Samsung Elecs. Co. Ltd.*, 2013 WL 4426512, *3 (N.D. Cal. Aug. 14, 2013) (relying on the "all-to-often ignored discovery principle" of proportionality to deny a motion to compel plaintiff "to go to great lengths" to produce information that the defendants could "do without").

**B. The Court Should Deny Plaintiffs' Motion to Compel Additional Customer Service and Warranty Documents.**

**1.  The burden of production would outweigh any possible benefit.**

In response to Plaintiffs' discovery requests regarding warranty and customer service documents (Request Nos. 21, 22, 31), Pella agreed to produce records from Pella's current and legacy customer service and warranty databases, but "object[ed] to producing customer service or field records that are maintained in hard copy files and neither categorized as to product, service or claim type, nor related to Named Plaintiffs, whether located at Pella corporate or Pella branches, as unduly burdensome to collect, review and produce and therefore not reasonably accessible under Rule 34."  ECF. Doc. 64-2 at 56-57, 60 (Responses).  Moreover, Pella noted that "[t]he customer service data Pella is producing from more reasonably accessible sources is comprehensive and adequate."  *Id.* at 57, 60.

Pella originally agreed to produce warranty and customer service data for Architect Series and Designer Series claims related to wood deterioration and/or wood rot, the condition purportedly at issue in this litigation.  *See id.*; *see also In re Pella Corp. Architect Series & Designer Series Windows Mktg., Sales Practices & Prods. Liab. Litig.*, 996 F. Supp. 2d at 1382 (holding the cases subject to the MDL "share factual issues arising from common allegations that Pella's Architect Series and/or Designer Series aluminum clad windows are defective in that they permit water to enter behind the windows, **resulting in premature wood rot and deterioration**" (emphasis added)).

More than four months later and after Pella had already gone through the effort of collecting the warranty and customer service data as it said it would, the PSC for the first time raised an objection to Pella's scope of production.  *See* ECF Doc. 65-10 at 4 (Letter from D. Bryson to J. Mandler dated December 1, 2014); ECF 65-11 at 4 (Letter from D. Wise to J.

Mandler dated December 8, 2014).  Following discussions with the PSC, Pella agreed to

supplement its production of data from these sources to include the following problem codes and

service types:

| Problem Group | Service Type |
|---|---|
| BOW/WARP/SAG | BOW/WARP |
| BOW/WARP/SAG | SAG |
| CONDENSATION | CONDENSATION BETWEEN GLASS |
| CONDENSATION | CONDENSATION (DGP ONLY) |
| CUSTOMER SATISFACTION | GOODWILL |
| CUSTOMER SATISFACTION | NA FIELD SERVICE |
| CUSTOMER SATISFACTION | NA WRITE OFF PER $250 POLICY |
| CUSTOMER SATISFACTION | TRAVEL EXPENSES |
| DAMAGED CLAD/CHANNEL | DAMAGED/FAILED CHANNEL |
| DAMAGED CLAD/CHANNEL | DAMAGED/FAILED CLADDING |
| DELAMINATION/LAMINATION ISSUE | DELAMINATION |
| DELAMINATION/LAMINATION ISSUE | LAMINATE FAILURE/DISCOLORATION |
| GLAZING BEAD | GLAZING BEAD PROBLEM |
| GLAZING SEAL | IG UNIT SEPARATING FROM SASH |
| GLAZING SEAL | SEALANT SQUEEZE OUT |
| HARDWARE ISSUES | REPLACE SASH AND BALANCES |
| IG ISSUES | IG SEAL FAILURE |
| INSTALLATION | NOT LEVEL |
| INSTALLATION | OUT OF SQUARE |
| INTERIOR FINISH | INT PAINT DEFECTS |
| INTERIOR FINISH | PAINT FINISH – INTERIOR |
| INTERIOR FINISH | STAIN FINISH – INTERIOR |
| LINER ISSUES | JAMB LINER LOOSE/DAMAGED/MISSI |
| LINER ISSUES | SASH LINER DEFECT |
| LINER ISSUES | SASH LINER LOOSE |
| MANUF OTHER | GAP OR OFFSET |
| OTHER | NO_DESC |
| OTHER | NO_TYPE |
| OTHER | OTHER - PLEASE DESCRIBE |
| OTHER | QUALITY VENDOR MANF |
| OTHER | RGA FULFILLMENT REIMBURSEMENT |
| UNIT SEAL AIR/WATER | AIR INFILTRATION |
| UNIT SEAL AIR/WATER | WATER INFILTRATION |
| UNKNOWN | UNKNOWN |
| WEATHERSTRIP ISSUES | GASKET LOOSE/DAMAGED/MISSING |

US.55664010.03

| WEATHERSTRIP ISSUES | WSTRIP LOOSE/DAMAGED/MISSING |
| WOOD AESTHETICS | WOOD SPLIT/DENT/KNOT |
| WOOD DETERIORATION | WOOD DETERIORATION |
| WOOD DETERIORATION | WOOD DETERIORATION PROLINE 06 |

*See* Ex. 7 (Letter from J. Mandler to J. Lucey with attachment dated January 13, 2015); Ex. 8 (Letter from J. Lucey to J. Mandler dated January 16, 2015 (confirming agreement)).  Pella is in the process of extracting this supplemental data from its warranty and customer service databases.

The PSC now moves to compel, not additional data from Pella's various warranty and customer service databases, but rather what the PSC refers to as the "underlying documents" on which the database reports are based.  Despite the fact that the PSC has deposed Pella's 30(b)(6) witnesses on both information technology (James Thomas) and customer service (Skip Barrick), the PSC has never identified or explained what it means by "underlying documents."  Pella has produced, and is in the process of supplementing in agreement with the PSC, customer service data from the CRM, Right Now, ILS, Service Module-SubService Extract, and Service Module-Service Closed electronic data sources, and has produced electronic associated files to those records where available.  Although Pella's customer service department also has a voluminous collection of hardcopy customer service-related files at its headquarters, *see* Declaration of Arvin Pleima ¶ 4 (Ex. 9), the Court should deny the Plaintiffs' motion as it applies to such files because the burden of their review and production would far outweigh the benefit.  Fed. R. Civ. P. 26(b)(2)(C)(iii); *Nicholas*, 373 F.3d at 543 (affirming district court's denial of additional discovery, finding it was "cumulative and duplicative, unduly burdensome, and harassing.").  Service events under warranty or for which credit requests are sought from distributors are logged in the Pella Service Module, from which Pella agreed to produce data relating to

Architect Series and Designer Series service events for the R&A codes agreed upon to the extent it has access.[17]

Pella's collection of hardcopy customer service files is vast, and is not organized in a manner that would easily accommodate the identification of responsive materials. At Pella Corporation, hardcopy customer service related files are stored in either banker's boxes or filing cabinets labeled by year of the service event or inquiry. Ex. 9 ¶ 4. Within each year, there are files relating to every type of service inquiry and every type of product; the files are not organized by product, service or claim type. *Id.* Accordingly, the identification of responsive files would require Pella to either (a) manually review each file for responsiveness and privilege before scanning for production, or (b) scan in every hardcopy file, process the files for Pella's review tool, OCR the files, apply the parties' agreed upon search terms, and manually review the reduced universe of materials for responsiveness and privilege. Pella estimates that it possesses 77 banker's boxes and 49 filing drawers of hardcopy customer service files. *Id.* ¶ 6. With such a massive number of hardcopy files, either of the above options would be incredibly time consuming, and add to Pella's already massive document production expense.[18]

---

[17] Pella Director of IT Jim Thomas testified about the Service Module and what data had been collected in his 30(b)(6) deposition on November 17, 2014. *See* J. Thomas Dep. Transcript at 174:6-175:23 (Ex. 10). The PSC also elicited extensive testimony about the Service Module in its depositions of Branch employees (in one case an independent owner) in relation to declarations submitted in opposition to Plaintiffs' proposed CMO-6. *See* Kathy McGuine Dep. Transcript at 51:14-23, 54:18-55:13, 87:4-24 (Ex. 11); Stephen Bingham Dep. Transcript at 39:16-20, 43:25-44:5, 45:11-14, 46:16-47:19 (Ex. 12); Ed Engelbrecht Dep. Transcript (Rough) at 21:9-23, 30:9-16 (Ex. 13). All witnesses testified that the Service Module is the sole tool for electronic entry of service events that captures the reason for the service call (i.e., wood deterioration, water infiltration, etc.).

[18] Some of Pella's hardcopy customer service files had been scanned at some point. Pella produced all responsive files that had been scanned. *See* ECF Doc. 65-2 (PELLA-CS00000439 – PELLA-CS00000821).

US.55664010.03

In contrast to the burden Pella would be forced to bear in producing these documents, the benefit of production would be minimal. Pella's pending supplemental production will provide the PSC with comprehensive warranty and customer service information. It will include data on every warranty or customer service claim in Pella's databases regarding Architect Series and Designer Series windows, related to the set of problems codes and service types agreed to by the PSC. *See* ECF Doc. 65-12 at 7 (Letter from A. Fiterman to D. Bryson et al. dated December 10, 2014); Ex. 7 (Email from J. Mandler to J. Lucey dated January 13, 2015); Ex. 8 (Email from J. Lucey to J. Mandler dated January 16, 2015).[19] This information should be more than sufficient for the PSC to pursue class certification, as well as the merits in the event certification is granted. The burden that would be imposed upon Pella in producing the hard copy documents far outweighs any benefit that would be gained. The Court should deny the motion to compel this discovery. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (court must limit discovery if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive"); Fed. R. Civ. P. 26(b)(2)(C)(iii) (court must limit discovery if "the burden or expense of the proposed discovery outweighs its likely benefit"); *Nicholas*, 373 F.3d at 543 (affirming district court's denial of additional discovery, finding it was "cumulative and duplicative, unduly burdensome, and harassing."); *Pippins*, 279 F.R.D. at 255; *Apple Inc.*, 2013 WL 4426512 at *3.

---

[19] Pella's agreement to produce nearly every R&A database field is generous, and was offered in the spirit of compromise. *See* The Sedona Conference® Database Principles at 21 (March 2011) ("Database Principle No. 1: Scope of Discovery: Absent a specific showing of need or relevance, a requesting party is entitled only to database fields that contain relevant information, not the entire database in which the information resides or the underlying database application or database engine.").

## 2. Cost-Shifting should be considered if the PSC believes these documents are so critical to the prosecution of its clients' cases.

In the alternative, should the Court decline to bar the PSC's requested discovery, the Court should order that the costs of Pella's collection, processing, and review of these hardcopy documents be shifted to Plaintiffs. Courts, both in and outside the Fourth Circuit, have recognized that cost-shifting may be appropriate where, as here, the benefit of the requested discovery is outweighed by the cost and burdens of production. *See, e.g.*, *Thompson v. U.S. HUD*, 219 F.R.D. 93, 98-99 (D. Md. 2003) ("Under Rules 26(b)(2)and 26(c), a court is provided abundant resources to tailor discovery requests to avoid unfair burden or expense and yet assure fair disclosure of important information. . . . The court can, for example, shift the cost, in whole or part, of burdensome and expensive Rule 34 discovery to the requesting party. . . ."); *Adair v. EQT Prod. Co.,* No. 10-37, 2012 U.S. Dist. LEXIS 75132, *12-13 (W.D. Va. May 31, 2012) ("I hold that the court may consider the cost of review of ESI for privileged or responsive information in deciding whether discovery imposes an undue burden or cost on a responding party. Furthermore, if the court were inclined to limit discovery based on the burden or cost of the review, I hold that the court could shift the costs of that review, either in whole or in part, to the requesting party."), *objections overruled*, 2012 U.S. Dist. LEXIS 90250 (W.D. Va. June 29, 2012); *Digene Corp. v. Third Wave Techs., Inc.*, No. 07-22, 2007 WL 5731934, at *2 (W.D. Wis. July 23, 2007) (as to marginally relevant documents, cost of privilege review shifted to party seeking disclosure); *FDIC v. Brudnicki*, 291 F.R.D. 669, 676 (N.D. Fla. 2013) ("Federal Rule of Civil Procedure 26(b)(2)(C) provides authority for shifting costs as part of the enforcement of proportionality limits.").

This is particularly true where the producing party, like Pella, has already expended considerable costs in discovery. *See, e.g.*, *Boeynaems v. La Fitness Int'l*, 285 F.R.D. 331, 341-

342 (E.D. Pa. 2012) ("The Court is persuaded, it appearing that Defendant has borne all of the costs of complying with Plaintiffs' discovery to date, that the cost burdens must now shift to Plaintiffs, if Plaintiffs believe that they need additional discovery. In other words, given the large amount of information Defendant has already provided, Plaintiffs need to assess the value of additional discovery for their class action motion. If Plaintiffs conclude that additional discovery is not only relevant, but important to proving that a class should be certified, then Plaintiffs should pay for that additional discovery from this date forward, at least until the class action determination is made.")

### C. The Court Should Deny the Plaintiffs' Motion to Compel "Underlying Sales Data."

In response to Plaintiffs' discovery request regarding sales data for Architect Series and Designer Series windows (Req. No. 24), Pella unambiguously stated that it would produce "unit sales information by branch, corporate direct, or national account by year for The Products, from 1997 to the present, which is how Pella maintains this information and is the time period reasonably available."  ECF Doc. 64-2 at 58 (Responses).  With regard to pre-1997 sales data, Pella stated that "sales data may or may not be available, but not in the same format.  Pre-1997 sales data, to the extent it still exists, was maintained in "bookings" and not by sales branch. That said, it will be produced for the time period and in the format in which it was preserved to the extent available."  *Id.*[20]  Consistent with these intentions, Pella produced three spreadsheet reports, PELLA-SALES00000001-3, on September 15, 2014, providing unit sales information in the format and scope promised.

The PSC first objected to the format of Pella's production of sales data on December 1, 2014, more than four months after receiving Pella's Responses, and two-and-a-half months after

---

[20] Pella objected to producing documents as to revenues.  ECF Doc. 64-2 at 58 (Responses). Plaintiffs have not challenged this objection.

27

receiving its unit sales production.  *See* ECF Doc. 65-10 (Letter from D. Bryson to J. Mandler dated December 1, 2014).  The PSC complained, at that time, that Pella's production of sales information consisted of "summaries of underlying documents kept in Pella's computer systems and prepared for this litigation."  *Id.*  In fact, Pella's production consists of reports generated from Pella's internal data warehouse of Architect and Designer Series window unit sales.  This production was made in compliance with CMO-2.  *See* CMO-2 § V(5)(B)(2)(d) ("A party possessing databases that contain relevant information shall produce the information in the agreed upon format for ESI or in Excel, except where the requesting party can show particularized need for another format.") (ECF Doc. 21).

The PSC now moves to compel additional sales discovery, not because of any alleged inadequacy or omitted information from the reports produced, but rather, for the production of the "underlying data" supporting the unit sales reports produced.  *See* ECF Doc. 64 at 17-19 (Pfs. Mem.).  However, Pella extracted its unit sales information from its data warehouse, a large internal data source that stores voluminous amounts of sales and other information.[21]  Its production of the unit sales information was compliant with CMO-2, and with the Federal Rules of Civil Procedure.  Rule 34(b)(2)(D) provides that, when responding to a request for electronically stored information, "[i]f the responding party objects to a requested form—or if no form was specified in the request—the party must state the form or forms it intends to use."  This is exactly what Pella did.  Responding to Plaintiffs' request, which did not specify a form of production, Pella unambiguously described how it intended to produce unit sales data, "which

---

[21] Pella 30(b)(6) deponent and head of Pella IT operations, James Thomas, estimated that the Pella data warehouse consists of 3 to 4 Terabytes of data relating to all products.  J. Thomas Dep. Transcript at 258:8-10 (Ex. 10).  This is 40 to 47 times what Pella has already produced.

US.55664010.03

[was] how Pella maintains this information." ECF Doc. 64-2 at 58 (Responses). The PSC did not raise any issue with this format until months after the production was made.

Insofar as the PSC is seeking the actual invoices, proposals, contracts, and other sales documents for every Architect Series and Designer Series window ever sold, such a request is unduly burdensome. Fed. R. Civ. P. 26(b)(2)(C)(iii). As an initial matter, these documents are almost universally housed at the branch level. Thus, to the extent Pella was required to collect and produce every sales document, it would have to collect the records from the branches. With regard to the Named Plaintiffs in this MDL litigation, Pella has done just that; and for the limited number of Named Plaintiffs in the litigation, this has been a manageable process. To do this for every purchase of Architect Series or Designer Series window ever made, however, would be impossible—especially given the Plaintiffs first demanded these documents after the deadline for document production passed.

Moreover, in the context of such a huge burden, the PSC would receive virtually no additional information through the "underlying sales documents" they seek, at least with regard to sales numbers. The PSC has not specified any other basis supporting its need for these documents. Accordingly, because Pella has already produced sales reports compliant with CMO-2 and the Federal Rules that provide comprehensive unit sales information, and because the burden of producing "underlying sales documents" greatly outweighs any possible benefit, the Court should deny the Plaintiffs' Motion to Compel. *See* Fed. R. Civ. P 26(b)(2)(C)(i), (iii); *Nicholas*, 373 F.3d at 543.

### D. The Court Should Deny Plaintiffs' Motion to Compel Pricing Data.

Although the PSC purports to move this Court to compel production of pricing data, *see* ECF Doc. 64 at 19-20 (Pfs. Mem.), Plaintiffs did not request "pricing" documents anywhere in

US.55664010.03

their Master Set of Discovery Requests.  Indeed, the terms "pricing" or "price" appear nowhere in the substance of their requests.  The PSC cannot now move to compel production of documents that were never requested under Rule 34 in the first instance.  *See* Fed. R. Civ. P. 37(a)(3) (defining circumstances where a motion to compel may be filed).  Although Plaintiffs did request documents related to Pella's "revenues, costs, and profits," Pella objected to that request in its entirety and the PSC has at no point challenged Pella's objections.  *See* ECF Doc. 64-2 at 59 (Req. No. 28 and Resp.).

Even assuming *arguendo* Plaintiffs did request "pricing" information, which they did not, the Court should still deny the motion.  As an initial matter, the PSC does not even attempt to establish that pricing information is relevant to any of its clients' claims or Pella's defenses. Accordingly, they have failed to satisfy Local Rule 7.04, which requires movants to "set forth the grounds for the motion, including a statement explaining why the discovery should be had within the context of the action…."

While the price that the Named Plaintiffs paid for their windows may feasibly be relevant to damages on their individual claims, Pella has already produced the proposals, contracts, and other sales documents, which evidence what the Named Plaintiffs were charged.  This is the only context in which pricing is relevant.  The "standard" price for a particular window, or the price paid by a particular branch or non-party customer for a particular window, are simply not relevant to any issue in this litigation.

Moreover, the price charged for a given window to a given branch varies for many reasons.  There are hundreds of window attributes and associated pricing variables, which lead to eight octillion different product combinations, and therefore pricing combinations.  *See* Ex.14 (Jeremy Oltman Dep. Transcript at 93:10-24, 199:8-200:14, dated November 13, 2014).

Accordingly, not only is pricing data not relevant, it is also not representative for class certification purposes.

**E.  The Court Should Deny Plaintiffs' Motion to Compel "Clean, Unredacted Copies" of Documents Because Plaintiffs Did Not Meet and Confer on this Motion and Because All of the Documents Plaintiffs Rely Upon Were Redacted for Privilege.**

The PSC did not meet and confer with Pella prior to filing their motion to compel "clean, unredacted copies" of partially redacted documents.  Indeed, without making a single inquiry of Pella, the PSC accuses Pella of partially redacting "[a] substantial portion of the first production" on responsiveness grounds, and contend that "[n]o redaction or relevance log was provided, leaving reviewing parties unable to determine the nature of most of the discovered redactions." ECF Doc. 64 at 21 (Pfs. Mem.).  The PSC identified seven documents they contend Pella redacted on responsiveness grounds.  *Id.*

In fact, all seven documents identified by the PSC were redacted for privilege – not responsiveness – and the majority of the redactions were described on privilege logs Pella produced *weeks before Plaintiffs filed their motion*.  *See* Ex. 15 (Privilege Log for Prod.021, logging redactions for PELLA-QUA00002915); Ex.16 (Supplemental Privilege Log for Prod.021, logging redactions for PELLA-JJUN00000208, PELLA-WP00001601); Ex. 17 (Privilege Log for Prod.022, logging redactions for PELLA-KDOW00000395, PELLA-TEST00015885); Ex. 18 (Privilege Log for Prod.024, logging redactions for PELLA-RBIS00006475, PELLA-KGAU00000880).[22]  CMO-4 provides the requirements for privilege logs and expressly contemplates that redactions will be made for privilege.  *See* CMO-4 ¶ 3(g);

---

[22] Pella produced a privilege log associated with its production no. 24 on January 30, 2015, in accordance with CMO-4; and produced a supplement to its privilege log associated with production no. 21 the same day. Under CMO-4, the parties have 30 days after production of a document source to produce a corresponding privilege log, which is why some of the logs had not yet been produced.

31

*see also* Fed. R. Civ. P. 26(b)(5)(A); *Keefer v. Erie Ins. Exchange*, No. 13-1938, 2014 U.S. Dist. LEXIS 29282, *14 (M.D. Penn. March 7, 2014) ("Defendant may, of course, assert privilege over portions of the case file and set forth the redacted portions in a privilege log").  As previously represented to this Court, Pella has not redacted documents on responsiveness grounds.  Pella has only redacted documents for privilege, in compliance with CMO-4 and the Federal Rules of Civil Procedure.

If the PSC had met and conferred with Pella prior to filing this motion – as it was required to (*see* Fed. R. Civ. P. 37(a)(1); L.R. 7.02; CMO 3 § I(J)) – Pella could have easily explained the nature of its redactions, and identified where on Pella's produced privilege logs the PSC could locate the entries for such redactions.  Instead, the PSC moved forward with a frivolous and unnecessary motion, wasting Pella's time as well as the time of the Court.  The Court should deny Plaintiffs' motion.  *See Hager*, 267 F.R.D. at 491 ("The failure to follow the requirement to confer, or attempt to confer, is grounds for the court to deny the motion to compel."); *Ambu*, 2000 U.S. Dist. LEXIS 241 at *6.

### F.  The Court Should Deny Plaintiffs' Demand for Unlimited Custodians.

This demand by the PSC is the most perplexing of all.  After the close of the deadline for document production, and without any meet and confer on the topic, the PSC moved to compel production of "all notes, memoranda, and emails" for all Pella workers.  The Court should deny this motion because it is contrary to the thirty-custodial-file limit Plaintiffs agreed to and the Court entered at the commencement of this MDL.

Beginning in March 2014, the parties negotiated at length regarding the terms of CMO-2.  As a result of these negotiations, the parties agreed that the PSC would be entitled to receive up to 30 custodial files.  The Court issued the final CMO-2 on July 28, 2014, consistent with the

US.55664010.03

parties' agreement on this limitation.  CMO-2 § III(A) (ECF Doc. 27).  Moreover, the Court

defined the term "Custodial File" to mean:

> Records produced for a given Custodian consisting of relevant,
> non-privileged: (1) paper documents that represent that
> Custodian's individual files (as opposed to departmental or
> company-wide files), (2) individual user drive assigned to that
> custodian (relevant to Pella Custodians, the H: drive), (3) non-
> duplicative Records on the Custodian's Local Hard Drive, and (4)
> the Custodian's individual email account.

*Id.* § II(F).  CMO-2 further provided that "[a]ny request by either Party for more than 30

Custodial Files will require a showing of good cause and shall be subject to a meet and confer

process."  *Id.* § III(A).

In its current motion, the PSC flatly ignores CMO-2—the order controlling the

production of email and other custodial data in this litigation.  As an initial and obvious point,

the PSC cannot seek to compel Pella to produce documents beyond what Pella has been required

to produce under a court order.  The parties extensively negotiated and mutually agreed upon the

terms of CMO-2.  The PSC and Pella jointly submitted CMO-2 for entry by the Court.  The

PSC's motion to compel is really an attempt to amend and eviscerate, without any input from

Pella, an important component of CMO-2.  It took Pella months to collect, process, review and

produce 27 custodial files.  After the close of the document production deadline that it has never

sought to extend, the PSC now wants Pella to go back and search the custodial files of every

single Pella worker.  At present, Pella has over 4,100 workers, including both full-time

employees and contract labor.  Decl. of Trent Alberts ¶ 4 (Ex. 19).  From a proportionality and

reasonableness standpoint, there is no argument to be made by the PSC that it needs every single

custodial file of every single worker.  That is the point of selecting a number of custodial files at

the outset of litigation.  MDLs across the nation regularly follow the same practice.  *See* Ex. 20

at § III(C)(5) (Pretrial Order No. 4, *In re Chantix Prods. Liab. Litig.*, MDL No. 2092 (N.D. Ala.)); Ex. 21 at 1-2 (Case Management Order No. 3, *In re Zimmer NexGen Knee Implant Prods. Liab. Litig.*, MDL No. 2272 (N.D. Ill.); Ex. 22 at 1-2 (Case Management Order No. 3, *In re Zelnorm® Litig.*, Case No. 280 (N.J. Super. Ct.)); Ex. 23 at 1 (Order Granting Motion for Discovery Schedule, *In re Prempro Prods. Liab. Litig.*, MDL No. 1507 (E.D. Ark.)); Ex. 24 at 21-22 (Case Management Order No. 4, *In re Lipitor*, No. 2:14-mn-2502 (D.S.C.)).  To do otherwise is contrary to the proportionality expected in Fed. R. Civ. P. 26(b)(2)(C)(iii).  The number of custodial files in this MDL didn't have to be 30, but the PSC agreed to that number voluntarily nearly a year ago.  It never even used its full 30 picks.  The PSC's request is ill-conceived and inappropriate.

### G. The Court Should Deny Plaintiffs' Motion Insofar as the Plaintiffs Seek Production of the "McGuine Subpoenaed Documents"

Although Plaintiffs purport to move to compel the "McGuine subpoenaed documents" in the introduction and conclusion to their opening memorandum, ECF Doc. 64 at 1, 24, they otherwise do not discuss the "McGuine subpoenaed documents" in the body of their memo. Plaintiffs did not attach Pella's response to the "McGuine subpoenaed documents" to the motion as required by L.R. 37.01(B); the PSC never actually requested the documents of Pella (they were requested in a subpoena directed to Kathy McGuine as an individual); did not meet and confer with Pella on these documents prior to filing their motion, as required by L.R. 7.04 and Fed. R. Civ. P. 37(a)(1); and Plaintiffs nowhere in their brief "set forth the grounds for the motion, including a statement explaining why the discovery should be had…" as required by L.R. 7.04.  The Court should deny Plaintiffs' motion as procedurally defective.

## CONCLUSION

For the reasons discussed above, the Court should deny Plaintiffs' Motion to Compel in its entirety.

Dated:  February 5 , 2014

s/ John P. Mandler
John P. Mandler
Amy R. Fiterman
Shane A. Anderson
Faegre Baker Daniels LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
john.mandler@faegrebd.com
amy.fiterman@faegerbd.com
shane.anderson@faegrebd.com

Michael T. Cole
Nelson Mullins Riley & Scarborough LLP
Liberty Center, Suite 600
151 Meeting Street
Charleston, SC 29401
mike.cole@nelsonmullims.com

35