**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| IN RE: PELLA CORPORATION | ) | |
| ARCHITECT AND DESIGNER SERIES | ) | 2:14-mn-00001-DCN |
| WINDOWS MARKETING, SALES | ) | |
| PRACTICES AND PRODUCTS | ) | **ORDER** |
| LIBAILITY LITIGATION. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

This matter is before the court on plaintiffs' motion to alter or amend the court's December 12, 2016 order ("Order") granting Pella Corporation's ("Pella") motion to exclude the expert testimony of Michael Louis ("Louis"), Daniel Clark ("Clark"), and Andrew Faulkner ("Faulkner," together with Louis and Clark, the "SGH Experts") of Simpson, Grumpertz, and Herger ("SGH").[1]  For the reasons set forth below, the court denies plaintiffs' motion.

## I.  BACKGROUND

The plaintiffs in this consolidated multi-district litigation are owners of certain Pella Architect Series and Designer Series Windows manufactured between 1997 and 2007 (the "Windows").  Plaintiffs allege that the Windows suffer from a common defect, resulting in damage to the Windows and adjoining walls.  ECF No. 135 at 8–9.  On the basis of these allegations, plaintiffs filed multiple actions in separate jurisdictions, which have been referred to this court for coordinated or consolidated pretrial proceedings. ECF No. 1.

---

[1] The instant motion to alter or amend is filed on the docket at ECF No. 176, the Order is filed on the docket at ECF No. 171, and Pella's motion to exclude is filed on the docket at ECF No. 129.

Plaintiffs identified the SGH Experts as experts in the field of engineering and produced a report detailing the SGH Experts' opinions in this case (the "SGH Report"). In that report, the SGH Experts opine that the Windows suffer from: (1) water leakage between the sash and the frame due to insufficient compression of the frame gasket; (2) sealant failure in the sash glazing pocket; and (3) sealant failure in the frame corner. ECF No. 135-1, SGH Report at 83. The SGH Experts further opine that the wood treatments used to protect these and other areas of the Windows are insufficient. Id. The SGH Experts base these opinions on data collected through site inspections, water testing, destructive testing, visits to Pella manufacturing plants, and a review of Pella documents and industry literature. Id. at 2. Much of the debate in this matter centers on the SGH Experts' water tests. The SGH Experts conducted two types of water tests: (1) "spray rack tests," in which water was sprayed on the outside of the Windows while a sealed vacuum was placed on the inside of the Windows to simulate wind-driven rain; and (2) "nozzle tests," in which a narrow stream of water was sprayed onto isolated portions of the Windows. SGH Report at 56–66.

On December 14, 2015, Pella filed a motion to exclude the SGH Expert's testimony pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). ECF No. 129. Pella argued that: (1) the SGH Experts' opinions were based on flawed testing and insufficient data; (2) the SGH Experts were not qualified to opine on the Windows' wood treatments, and that their wood treatment opinions were based on unreliable methodology; and (3) the SGH Experts' opinions should be excluded due to their spoliation of evidence. Id. at 14–19, 24, 25, 28–31. In response, the plaintiffs pointed to the SGH Experts' qualifications and their reliance on

certain industry standards governing the investigation of water leakage—particularly, American Society for Testing and Materials ("ASTM") standard E2128—as assurances of their methodological reliability. ECF No. 135 at 12–18, 23–24. The court ruled that: (1) the SGH Experts' inspections were not enough to sustain their opinions; (2) the SGH Experts' spray rack tests and nozzle tests did not comply with ASTM E2128; (3) plaintiffs had failed to explain how the SGH Experts reliably extrapolated from their observations to find a product-wide defect; (4) the methodology underlying the SGH Experts' wood treatment opinions was not reliable; and (5) the SGH Experts were not qualified to render an opinion on the sufficiency of Pella's wood treatment. ECF No. 171.

On January 17, 2017, plaintiffs filed the instant motion to alter or amend the Order pursuant to Federal Rule of Civil Procedure 59. ECF No. 176. Pella responded on February 16, 2017, ECF No. 179, and simultaneously filed a motion to strike previously undisclosed affidavits and testimony that were filed alongside plaintiffs' motion. ECF No. 180. Plaintiffs filed a reply in support of their motion to alter or amend, ECF No. 181, and a response to Pella's motion to strike on March 2, 2017. ECF No. 183. Pella filed a reply in support of its motion to strike on March 9, 2017. ECF No. 184. The motions are now ripe for the court's review.

## II.  STANDARDS

### A.    Motion to Alter/Amend

While Rule 59(e) does not provide a standard under which a district court may alter or amend a judgment, the Fourth Circuit has recognized that a court may grant a Rule 59(e) motion "only in very narrow circumstances:  (1) to accommodate an

intervening change in controlling law, (2) to account for new evidence not available at trial, or (3) to correct a clear error of law or prevent manifest injustice." Hill v. Braxton, 277 F.3d 701, 708 (4th Cir. 2002).  Rule 59(e) motions may not be used, however, to make arguments that could have been made before the judgment was entered.  See Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998).  Moreover, "[a] party's mere disagreement with the court's ruling does not warrant a Rule 59(e) motion, and such a motion should not be used to rehash arguments previously presented or to submit evidence which should have been previously submitted." Sams v. Heritage Transp., Inc., No. 2:12-cv-0462, 2013 WL 4441949, at *1 (D.S.C. August 15, 2013).

Rule 59(e) provides an "extraordinary remedy that should be used sparingly." Pac. Ins. Co., 148 F.3d at 403 (internal citation omitted); Wright v. Conley, No. 10-cv-2444, 2013 WL 314749, at *1 (D.S.C. Jan. 28, 2013).  Whether to alter or amend a judgment under Rule 59(e) is within the sound discretion of the district court. See, e.g., Bogart v. Chapell, 396 F.3d 548, 555 (4th Cir. 2005).

**B.     Federal Rule of Evidence 702 and Daubert**

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

District courts serve as gatekeepers for expert testimony. The court has a "special obligation" to ensure that expert testimony is relevant and reliable. <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 147 (1999).

Under <u>Daubert</u>, the court must address two questions: (1) whether the expert's testimony is based on "scientific knowledge"; and (2) whether the testimony "will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592. The first question is answered by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." <u>Id.</u> at 592–93. Several nondispositive factors should be considered in determining the reliability of a particular scientific theory or technique: whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has attained general acceptance in the pertinent scientific community. <u>See id.</u> at 593–94. In considering these factors, the focus "must be solely on principles and methodology, not on the conclusions that they generate." <u>Id.</u> at 595. The factors are not exclusive; what factors are relevant to the analysis "depends upon the particular circumstances of the particular case at issue." <u>Kumho Tire</u>, 526 U.S. at 150.

The second inquiry "goes primarily to relevance." <u>Daubert</u>, 509 U.S. at 591. Relevance is determined by ascertaining whether the testimony is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute. <u>Id.</u> at 593. "A review of the caselaw after <u>Daubert</u> shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, advisory committee's notes. "<u>Daubert</u> did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" <u>Id.</u>

(quoting <u>United States v. 14.38 Acres of Land Situated in Leflore Cnty.</u>, 80 F.3d 1074, 1078 (5th Cir.1996)).

### III. DISCUSSION

Plaintiffs argue that the court erred by:

(1)    Failing to consider the qualitative nature of engineering investigations;

(2)    Finding that the SGH Experts failed to investigate alternative causes;

(3)    Finding that SGH used inappropriate testing methodologies;

(4)    Holding to the SGH Experts to rigid statistical requirements in evaluating the sufficiency of the SGH Experts' sample; and

(5)    Finding that Louis was not qualified to opine on wood treatment.

The court addresses each argument in turn.

### A.    Qualitative Analysis

Plaintiffs first argue that

[t]he [c]ourt erred by analyzing the technical field of engineering with the inapposite framework of the rigid and quantitative practices of laboratory science. The practice of engineering is not based on strict adherence to the four corners of any particular standard or guideline, and is a qualitative practice rather than quantitative. In other words, engineering investigations and resulting opinions are not susceptible to the same method of scrutiny as a pharmaceutical or a medical device investigation and resulting opinions.

ECF No. 176 at 4–5.

At the outset, it should be noted that to the extent plaintiffs are suggesting that <u>Daubert</u> somehow applies with less force in the engineering context they are "dead wrong." <u>Nease v. Ford Motor Co.</u>, 848 F.3d 219, 229 (4th Cir. 2017) (rejecting the argument that <u>Daubert</u> does not apply to the field of engineering). The Fourth Circuit recently confirmed that the reliability of an engineering expert's opinion must be

evaluated in the same way as every other expert.  Id. (finding the district court erred by failing to use "Daubert's guideposts or any other factors to assess the reliability" of an engineering expert's opinion).  Daubert's test is "flexible," to be sure, but it is still guided by the familiar factors of testability, peer review, error rate, and general acceptance in the relevant scientific community.  See id. at 232 (evaluating proposed engineering expert's opinion under these factors).  Thus, to the extent plaintiffs argue that the court erred by analyzing these factors, their argument can be dismissed out of hand.

Indeed, it is not entirely clear how plaintiffs would have the court assess the reliability of the SGH Experts' opinions.  Plaintiffs' insistence that engineering is a "qualitative" field of expertise suggests that they believe the court should have found that the SGH Experts' opinions were reliable based on the SGH Experts' engineering experience alone.  ECF No. 176 at 4–6.  The court does not doubt that the SGH Experts are experienced, qualified engineers.  Nor does the court doubt that, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  Fed. R. Evid. 702 advisory committee notes.  But when an expert offers an opinion based on experience, he "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Id.

The SGH Experts failed to do so here.  As outlined in the Order, the SGH Experts took a number of investigative steps in addition to their water testing.  Order at 7.  According to Louis, the results of this non-testing component of the investigation (the

"non-testing investigation")[2] led the SGH Experts to believe the Windows were suffering from defect-related leakage.  Indeed, Louis offered a cogent explanation for why, in his experience, the data gathered through these efforts—particularly, the location of wood damage on the Windows—supported this hypothesis.  ECF No. 136-3, Louis Dep. at 151:15–19 (explaining that "whenever we've seen that damage, the staining and damage on the windows, we've always associated that with leakage").  But Louis did not say that the data gathered through non-testing investigation permitted him to conclude, as he has done in his opinion, that the Windows suffered from defect-related leakage.  Indeed, Louis admitted that leakage is not the only possible cause of wood damage and it is impossible to determine the cause of wood damage simply by viewing the damage itself.  See id. at 154:14–16 (stating that nozzle tests were conducted on visibly stained Windows that passed spray rack tests to determine "what has caused the stain" because "[the cause has] not been established").  Plaintiffs' briefing also indicated that the water tests were fundamental to the SGH Experts' opinions.  ECF No. 135 at 35–36 ("While issues with surrounding building components could possibly contribute to water infiltration/damage were documented and examined, they do not render Mr. Louis's opinions unreliable because the testing confirmed that the defective design of the Windows alone is sufficient to cause the damage observed in the field.") (emphasis in original).  This led the court to conclude that the SGH Experts could not have rested their conclusions solely on the non-testing investigation.  Order at 7–8 ("Because it is impossible to determine the specific cause of wood staining by simply viewing the stain

---

[2] The court uses the term "non-testing" to refer to the SGH Experts' investigative efforts outside of the water testing.  The court recognizes that some of these efforts included destructive lab testing, but the lab tests are not a source of debate in this matter.

itself, [] the SGH Experts must rely on more than visual observations to support their conclusion that defect-related leakage, and not some other mechanism, . . . caused the observed wood staining and deterioration.").  Put differently, the court found—based on Louis's own explanation of the SGH Experts' methodology—that his experience-based evaluation of the evidence produced by the non-testing investigation was not a "sufficient basis" for the SGH Experts' opinions.  Instead, the court found that the testing results formed an indispensable part of the foundation for the SGH Experts' conclusions.  Naturally, this led the court to review the SGH Experts' testing methodology, which, according to plaintiffs, was performed "pursuant to," and "in accordance with," ASTM E2128.  ECF No. 135 at 12, 23–25.  Thus, the court's evaluation of the SGH Experts' compliance with ASTM E2128 was not based on a refusal to recognize their experience in the "qualitative" field of engineering; it was based on the court's finding that the SGH Experts failed to explain how their "qualitative," experience-based analysis provided a sufficient basis for their opinions.

    To the extent plaintiffs argue that the court should have simply deferred to the SGH Experts' experience in applying the ASTM E2128 standard, the court has already explained how such deference would defeat the purpose of having any standard at all.  See Order at 15 ("Plaintiffs seek to invoke ASTM E2128 to demonstrate the SGH Experts' methodological reliability, but then argue that their methodology should not be scrutinized because ASTM E2128 leaves the bulk of testing design to the expert's discretion.  This leaves the court without any means of evaluating the reliability of the

SGH Experts' nozzle tests.").[3]  Ultimately, the court was obligated to evaluate the reliability of the SGH Experts' opinions.  Because those opinions were dependent, at least in part, on the testing results, the court was obligated to evaluate the reliability of the SGH Experts' testing methodology under Daubert.  The plaintiffs relied on their compliance with ASTM E2128 to establish the reliability of that methodology, and the court evaluated their compliance using the evidence that was presented.  The court sees no error in this approach and declines plaintiffs' invitation to reconsider its decision using a more "qualitative" alternative.

## B.  Consideration of Alternative Causes

Plaintiffs next argue that the court erred in finding that the SGH Experts failed to consider alternative causes of the Windows' deterioration.  ECF No. 176 at 7–14.  More specifically, plaintiffs argue that the court ignored a wide range of evidence showing that the SGH Experts did, in fact, consider alternative causes, and incorrectly determined that ASTM E2128 was the "singular method by which alternative causes [could] be reliably ruled out."[4]  Id. at 9.

---

[3] While the cited quotation was directed at a narrower issue related to the SGH Experts' spray nozzle tests, the underlying rationale can be applied to plaintiffs' more general argument that the court should not scrutinize the SGH Experts' compliance with ASTM E2128, or any of the other standards they have highlighted in support of the SGH Experts' methodology.

[4] Plaintiffs also contend that the court "erred in finding that Daubert requires all experts to remove any semblance of a starting hypothesis."  ECF No. 176 at 8.  The court held no such thing.  In fact, the court explicitly assumed that "the SGH Experts' decision to focus their investigation on possible defect-related leakage" was appropriate.  Order at 7.  Thus, the Order was plainly not based on the fact that the SGH Experts began their investigation with a starting hypothesis.

As discussed in greater detail below, the court simply determined that the SGH Experts' conclusions were dependent, in part, on water testing that failed to "elevate the SGH Experts' defect-theory above other potential causes."  Id. at 8.  Put differently, the court found that the SGH Experts' testing did not actually test—much less support—their

Plaintiffs' first argument misapprehends the court's Order. The court has always been aware of the fact that the water tests were one piece of a much larger investigation that included residential inspections, laboratory and destructive testing, and a review of Pella's internal documents, building codes, and relevant deposition testimony. Order at 2. In fact, the court explicitly stated that it was willing to assume that the SGH Experts' initial hypothesis was reasonable in light of their non-testing investigative efforts. Id. at 7. However, as explained above, the court determined that such efforts were not sufficient to confirm the SGH Experts' design-defect theory without further testing. The court has reviewed plaintiffs' response to Pella's motion to exclude and remains unconvinced that the SGH Experts' opinions would stand if the water tests were set aside. On the contrary, plaintiffs repeatedly highlighted the SGH Experts' "industry recognized testing" as the basis for their conclusions. ECF No. 135 at 11. Plaintiffs even acknowledged that the SGH Experts were only able to conclusively rule out alternative causes by using the water tests. Id. at 35–36 ("While issues with surrounding building components could possibly contribute to water infiltration/damage were documented and examined, they do not render Mr. Louis's opinions unreliable because the testing confirmed that the defective design of the Windows alone is sufficient to cause the damage observed in the field.") (emphasis in original).

Because the water test results were a necessary predicate to the SGH Experts' defect opinions, it does not matter whether other information existed that supported those opinions. The court did not fail to examine the totality of the SGH Experts'

---

hypothesis because the results were consistent with both the hypothesis and the null hypothesis that the Windows' damage was not caused by defect-related leakage.

investigation, it simply determined that the water tests formed a critical link in the chain of logic the SGH Experts used to form their opinions. When one link in a chain breaks, the chain breaks; there is no need to examine the remaining links to determine if the chain is broken. The SGH Experts may well have relied on more than just water testing, but so long as they relied on the testing at all, plaintiffs bore a burden to show that such testing was conducted in a reliable manner.

Plaintiffs also assert that the court identified "ASTM E2128 [as] the singular method by which alternative causes can be reliably ruled out." ECF No. 176 at 9. This assertion is incorrect. The court simply found that, as a factual matter, the SGH Experts relied substantially on the water tests to rule out alternative causes. For the reasons described above, the court fails to see any error in this finding.[5]

---

[5] Plaintiffs provided an affidavit from Louis alongside their motion to alter or amend in which Louis attempts to clarify the court's "misinterpretations" of his methodology. ECF No. 176-2, Louis Aff. ¶ 2. In this affidavit, Louis indicates that he did not rely on the water tests to rule out condensation or homeowner maintenance as alternative causes. Id. ¶ 13. Louis also indicates that he did not rely on the water tests to rule out installation defects as a potential alternative cause, though he is somewhat less clear on this point. Id. Thus, Louis now appears to assert that he could have offered his defect opinion without considering the water testing results, or at least, that he could have concluded that the Windows suffered from some form of defect-related leakage, though the precise mechanism may have remained hidden.

Without addressing any objections that might be made to the credibility of these assertions or the question of whether such assertions are barred by the sham affidavit rule, the court simply find that the time for "clarification" has long passed. It is well-established that "[a] party seeking reconsideration pursuant to Rule 59(e) is not permitted to present arguments, theories, or evidence that could have been presented prior to the issuance of the judgment." Moise v. AlliedBarton Sec. Servs., LLC, No. 3:12-cv-02022, 2015 WL 5037010, at *1 (D.S.C. Aug. 26, 2015); see also Pacific Ins., 148 F.3d at 403 ("Rule 59(e) motions may not be used, however, to raise arguments which could have been raised prior to the issuance of the judgment."). Plaintiffs bore the burden of proving the admissibility of the SGH Experts' opinions by a preponderance of proof. Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001). Plaintiffs were clearly aware of the nature of Pella's challenge to those opinions—particularly, Pella's argument that the SGH Experts failed to consider alternative causes and Pella's numerous objections to

## C.     SGH Experts' Testing Methodology

Plaintiffs next argue that the court committed multiple errors in evaluating the SGH Experts' testing methodology.  With respect to the spray rack tests, plaintiffs argue that the court:  (1) mistakenly concluded that the test pressures used by the SGH Experts did not simulate actual weather events, (2) erred in finding that AAMA 511 is a more reliable method for determining the appropriate test pressures, (3) ignored crucial language that softened the requirements of ASTM E2128, and (4) ignored the fact that Pella's experts utilized similar testing methods.  ECF No. 176 at 14–25.  Plaintiffs offer a number of similar arguments against the court's treatment of the nozzle tests, and add that the court failed to understand the nature and purpose of the nozzle tests.  Id. at 25–32.

### 1.     Spray Rack Tests

#### a.     Simulation of Actual Weather Events

Plaintiffs contend that several of the test pressures used during the spray rack tests undoubtedly replicated weather events which the Windows would have actually experienced, and therefore, provide reliable evidence that the Windows suffered from defect-related leakage.  Id. at 15–16, 20–22.

---

the SGH Experts' testing protocols.  If, as Louis now claims, the testing data was somehow not essential to the SGH Experts' ultimate conclusion that defect-related leakage was the cause of the Windows' damage, plaintiffs should have presented this argument in their initial response to Pella's motion.  Regardless of whether Louis's new assertions are true, it is not manifest injustice to require a party to provide whatever information it needs to decide an issue when the issue is actually pending before the court.  Allowing plaintiffs to come back and provide additional "clarification" of this sort on a motion to alter or amend would wreak havoc on the judicial system.

In order to address this argument, the court must reiterate why it found that the

test pressures needed to replicate weather events in the first place. As the court explained

in the Order:

> [ASTM E2128] contemplates investigative testing as a means of "verify[ing] and extend[ing] a hypothesis arrived at during the document review and inspection phases." ASTM E2128 § 10.1. The "primary purpose" of this testing "is to recreate leaks that are known to occur," and compare these recreations to evidence of the actual leaks, such as wood staining. Id. § 10.1.1.3. But the standard makes it clear that [to the extent practicable[6]] these recreations "should simulate the actual conditions under which leakage has been observed." Id. § 10.2.1. "Testing at an environmental exposure level that the building has never experienced and has little likelihood of experiencing may lead to incorrect conclusions." Id. § 10.2.2. These constraints strengthen the inferences that can be drawn from these recreations by tying them to the facts of the case. Showing that the Windows will leak under a given set of conditions undeniably provides some support for the assertion that the Windows leaked in a particular case, but the more the tested conditions differ from the conditions the Windows actually experienced, the more likely it is that the testing does not replicate the Windows' actual performance. On the other hand, the more the tested conditions "simulate the actual conditions under which leakage has been observed," id. § 10.2.1, the more confident one can be that the results are representative of the Windows' actual performance. Put simply, to the extent the SGH Experts' testing failed to recreate actual conditions, it failed to examine whether the Windows possess the propensity to leak under the facts of this case. Thus, the constraints imposed by ASTM E2128 are necessary to reduce the analytical gap between the SGH Experts' testing and their conclusions. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Order at 8–9. The court's concern with the test pressures used during the spray rack tests

was born out of its concern that the tests were being used to represent the Windows'

---

[6] As discussed in greater detail below, plaintiffs take issue with the court's omission of this language in describing § 10.2.1. The court will address this argument in a separate section, but for the time being, it wishes to add this language to more accurately describe the ASTM E2128 standard.

performance under real-world conditions, and thus, needed to be designed in such a way as to "recreate" the types of conditions that could have actually caused the damage to the Windows.[7]

After reviewing the parties' arguments and evidence, the court found that "the SGH Experts conducted their spray rack tests in a manner that was inconsistent with the general purposes underlying ASTM E2128." Id. at 13. This finding was based on: (1) the SGH Experts' decision to ignore AAMA 511, a standard that is specifically designed to adapt spray rack testing protocols—which are generally used for quality assurance purposes under ASTM E1105—for diagnostic purposes; (2) the fact that AAMA 502, which is a performance testing standard for newly installed products, used a maximum test pressure of 2/3 of the standard test pressure, suggesting that even lower pressures would be appropriate for diagnostic testing; and (3) the lack of evidence that

_____

[7] It appears plaintiffs have interpreted the court's discussion of AAMA 511, which calls for the use of historical weather data in designing the test conditions, as well as ASTM E2128 § 10.2.1's reference to "the actual conditions under which leakage has been observed," to require the replication of specific weather events. ECF No. 176 at 20–21. Plaintiffs argue that this finding was in error, as such a requirement would be both impractical and of questionable value, given that wood deterioration progresses over time and is the result of repeated weather events. Id. Had the Order included such a finding, the court would be inclined to agree. However, a careful reading of the court's Order reveals that it never found fault in the SGH Experts' failure to replicate any particular weather event. The court's concern was simply that the test pressures did not appear to be generally realistic. To the extent the court's use of the phrase "actual weather events" was misleading, the court now clarifies that it does not believe ASTM E2128 requires the recreation of any specific weather event. When the court refers to "actual weather events" it has in mind only the type of weather events that could have realistically caused the observed damage. To be sure, the SGH Experts' apparent lack of interest in tailoring their spray rack tests to the different locations they tested weighed heavily in the court's analysis, but the court was not concerned by the fact that the SGH Experts did not pick out specific weather events to recreate.

the SGH Experts engaged in any effort to tailor the testing conditions to actual weather conditions.

The test pressures used by the SGH Experts were measured in relation to the Windows' "standard test pressure"—a measure of air pressure that is derived from the manufacturer's performance rating. Order at 10–11. The SGH Experts conducted spray rack tests at zero pressure, 1/3 of the standard test pressure, 2/3 of the standard test pressure, and the full standard test pressure. Id. Plaintiffs now contend that three of the four test pressures used during the spray rack tests—zero pressure, 1/3 pressure, and 2/3 pressure—replicated weather events that the Windows would have experienced. ECF No. 176 at 15. Therefore, plaintiffs' argue, "the only tests that should be potentially excluded under the Court's current analysis were those at full pressure." Id.

At the outset, this argument misapprehends the nature of the Rule 702 inquiry. Rule 702 deals with the admissibility of opinions, not the admissibility of data underlying such opinions. For the court to allow the SGH Experts to present their opinions after finding that some portion of the data underlying those opinions was gathered in an unreliable manner, the court would also have to find that, when such unreliable data was removed from the equation, the remaining data provided a sufficient basis for the opinions under Rule 702. Of course, neither the SGH Experts nor the plaintiffs have given the court any guidance on how to determine what testing data was sufficient to support the SGH Experts conclusions and what data simply provided additional support.

Moreover, the bulk of the materials plaintiffs cite in support of this argument— namely, the deposition testimony of Phillip Drake, ECF No. 176-10, and the affidavits of Louis, ECF No. 176-2, Thomas Schwartz, ECF No. 176-12, and Rhett Whitlock

("Whitlock"), ECF No. 176-8—were first provided alongside plaintiffs' motion to alter or amend. As explained above in footnote 6, "[a] party seeking reconsideration pursuant to Rule 59(e) is not permitted to present arguments, theories, or evidence that could have been presented prior to the issuance of the judgment." Moise, 2015 WL 5037010, at *1; see also Pacific Ins., 148 F.3d at 403 ("Rule 59(e) motions may not be used [] to raise arguments which could have been raised prior to the issuance of the judgment."). Plaintiffs contend that these materials should not be excluded because they show "that SGH's investigation, methodology, and sample sizes are supported by peer review and scientifically acceptable standards" and "clarify testimony" relied upon in the court's Order. ECF No. 183 at 2–3. Plaintiffs' basic argument is that the court should exercise its authority to review these affidavits because they show that the SGH Experts' testing methodology was reliable, and thus, the court's refusal to consider them would result in manifest injustice.[8] Id. Plaintiffs underlying assumption appears to be that, if the evidence presented in connection with their motion to alter or amend would have been sufficient to defeat the motion to exclude, then it would be manifestly unjust for the court not to consider such evidence. But this approach would place no restrictions on a Rule 59(e) movant's ability to re-litigate old issues using previously available evidence because the question of whether to consider such evidence and the question of whether to

_____

[8] Plaintiffs also cite to cases in which courts have considered previously available evidence on a motion to alter or amend after identifying some other error in their initial ruling. E.g. State Line Fishing & Hunting Club, Inc. v. City of Waskom, Tex., 754 F. Supp. 1104, 1109 (E.D. Tex. 1991) (allowing plaintiffs to submit additional, previously available evidence on a motion to alter or amend, after finding that "plaintiffs did submit sufficient evidence initially to create a material issue of fact, and thus preclude summary judgment"). But these cases do not allow a party to establish the court's error using such evidence, and plaintiffs have failed to show that the court erred in its evaluation of the evidence that was presented in the initial round of briefing.

alter or amend the judgment would both be decided by asking whether the evidence—

previously available or not—would have allowed the movant to prevail on the initial

motion.  Perhaps, some courts have utilized their discretion in this way, see Lonardo v.

Travelers Indem. Co., 706 F. Supp. 2d 766, 812 (N.D. Ohio 2010), on reconsideration in

part (July 21, 2010) (considering newly produced, previously available evidence on

motion to reconsider where such evidence showed that the movant satisfied the

applicable standard under the initial motion), but this court declines to do so.  The court's

interest in finality is simply too great.  Pella's motion to exclude was filed over 18

months ago.  ECF No. 129.   The parties and the court have spent a great deal of time and

resources analyzing the matter and to allow plaintiffs to rely on evidence that could have

easily been included in the initial round of briefing would waste significant resources and

result in unfair prejudice.

　　　　Finally, even if this new evidence were considered, the court remains

unconvinced that the test pressures were as realistic as plaintiffs claim.  Plaintiffs explain

that the Windows in question have a performance rating of R-40, which corresponds to a

"design pressure" of 40 pounds per square foot ("psf").  ECF No. 176 at 21–22.  The

"full" test pressure used by the SGH Experts is 15% of the design pressure—in this case,

6 psf.  Id. at 22.  Plaintiffs claim that the Windows would have been exposed to this level

of pressure during their lifetime.  Id. at 20.  However, plaintiffs provide very little

information regarding how often the Windows would face such exposure or explain what

pressure would be associated with an ordinary weather event.  The frequency of exposure

is especially important given plaintiffs' recognition that the Windows' deterioration was

caused by multiple weather events that caused progressive damage over time.  Id. at 21.

Louis and Whitlock provide some evidence in this regard, explaining that 1/3 of the Windows' standard test pressure is equivalent to a 28–30 mile per hour wind speed and 2/3 of the Windows' standard test pressure is equivalent to a 40–44 mile per hour wind speed. Louis Aff. ¶ 6; Whitlock Aff. ¶ 10. Louis goes on to add that, in his experience, "every window would have withstood up to at least 3-second gusts of 50 mile per hour winds at some point during their service lives. Thus, every window also experience[d] the [1/3 test pressure] and [2/3 test pressure] winds that the windows were tested to." Louis Aff. ¶ 6. But 3-second gusts are a far cry from the 5 minutes of sustained pressure the SGH Experts applied in their spray rack tests. If the most Louis can say is that every Window he tested would have experienced 3-second gusts of 50 mile per hour winds "at some point," the court has a hard time finding that subjecting the Windows to the equivalent of 40 mile per hour winds for a period of 5 minutes constitutes a reasonable recreation of the events under which the leakage was likely to have occurred. Therefore, even if the newly submitted affidavits and testimony were considered, the court would find no obvious error in its conclusion that the spray rack tests subjected the Windows to conditions they were not likely to have experienced. At the very least, the court believes that plaintiffs have failed to show that the spray rack tests complied with ASTM E2128's warning not to "test[] at an environmental exposure level that the building has never experienced and has little likelihood of experiencing." ASTM E2128 § 10.2.2.

### b. Reliance on AAMA 511

Plaintiffs take issue with the court's statement that "it is indisputable that the SGH Experts simply ignored AAMA 511, a standard which is specifically referenced by ASTM E2128 § 10.2.7 and clearly applicable." ECF No. 176 at 16–17 (quoting Order at

13).  The court sees no error in this statement.  It is a fact that AAMA 511 <u>is</u> explicitly referenced in ASTM E2128—the standard plaintiffs pointed to as an assurance of methodological reliability—and AAMA 511 <u>does</u> provide instruction on how to use spray rack testing for diagnostic purposes—the very thing the SGH Experts claim to have done.  ECF No. 129-10, AAMA 511.  Plaintiffs do not—and could not—challenge these facts.

Instead, plaintiffs point out that experts have historically used other methods to adapt spray rack testing for diagnostic purposes, noting that AAMA 511 was not referenced by ASTM E2128 until 2008.  ECF No. 176 at 16.  But the court did not rest its holding solely on the SGH Experts' failure to follow AAMA 511.  Order at 13 ("Even if the court were to set AAMA 511 aside and consider only the language of ASTM E2128, it cannot square the SGH Experts' test design with § 10.2.1's directive to 'simulate the actual conditions under which leakage has been observed.'" (quoting ASTM E2128 § 10.2.1)).  The court simply observed that, by ignoring AAMA 511, the SGH Experts willingly chose not to utilize a "guideline"[9] that addresses the precise task they were trying to accomplish.  The court thinks this observation was plainly relevant to the <u>Daubert</u> inquiry.  <u>Kumho Tire</u>, 526 U.S. at 152 (explaining that the purpose of <u>Daubert</u>'s gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same

_____

[9] Plaintiffs contend the court incorrectly determined that AAMA 511 was a "standard" and not a "guideline."  ECF No. 176 at 17.  To the extent plaintiffs emphasize this distinction to argue that compliance with AAMA 511 is not <u>required</u>, the court finds that this argument does not impact the analysis, for the reasons described above.

level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

Plaintiffs also argue that "AAMA 511 is inherently suspect" because, unlike ASTM standards, AAMA guidelines are developed by a trade association that represents the interests of window manufacturers and suppliers. ECF No. 176 at 17. The court first notes that AAMA 511 is referenced by ASTM E2128, so it would appear that AAMA 511 is reliable enough for the "broad consensus of manufacturers, design professionals . . . , construction professionals, and other interested end-users" who approve and review ASTM standards. See id. (arguing that "AAMA's guidelines are created by manufacturers; however, ASTM guidelines are reviewed and approved by a broad consensus and should thus be afforded more weight"). More importantly, the evidence plaintiffs cite in support of this argument could have been presented prior to the court's ruling on Pella's motion to exclude, but was not. Therefore, the court will not consider it. Pacific Ins., 148 F.3d at 403 ("Rule 59(e) motions may not be used [] to raise arguments which could have been raised prior to the issuance of the judgment.").

### c.    Incomplete Quotation of ASTM E2128

Plaintiffs also take issue with the court's statement that "it cannot square the SGH Experts' test design with [ASTM E2128] § 10.2.1's directive to simulate the actual conditions under which leakage has been observed." ECF No. 176 at 19 (quoting Order at 13). Plaintiffs argue that the court's omission of the phrase "to the extent practical" in its quotation of ASTM E2128 § 10.2.1 demonstrates some misunderstanding of that section. To be clear, the court fully recognizes that ASTM E2128 allows an investigator to adjust his methodology to account for certain practical limitations. However, the court

is simply not convinced that the SGH Experts took all the practicable steps they could to replicate the type of weather events that could have actually caused the Windows' deterioration.

Plaintiffs argue that the SGH Experts could not have simulated the conditions under which the leakage "was observed" because many homeowners would not have observed the leakage that caused the Windows' damage, especially given the fact that the Windows were damaged by multiple weather events over a period of time. In plaintiffs' view, the fact that the SGH Experts could not practically identify the precise weather events that caused the damage gave them permission to simply ignore historical weather data altogether. The court does not read ASTM E2128 so narrowly. It is clear that the whole point of diagnostic testing is to subject the windows to conditions that simulate those that are believed to have caused the leakage in the field. ASTM E2128 § 10.2.1 ("The service history of the building and the environmental exposure history of the site must be considered in planning a testing program. To the extent practical, the selected test method should simulate the actual conditions under which leakage has been observed."); ASTM E2128 § 10.2.2 ("Testing at an environmental exposure level that the building has never experienced and has little likelihood of experiencing may lead to incorrect conclusions."); ASTM E2128 § 10.2.8 ("Judgement (sic) is needed in determining the duration of water testing, recognizing that the ultimate objective of diagnostic testing is to recreate existing leakage behavior that occurs under in-service conditions."); see also AAMA 511 § 4.2.1.1 ("The objective of forensic water testing is to identify the leak path(s) through simulation of the weather events that produced the reported water penetration."). Where it is impossible to identify the exact dates when

previous leakage occurred, it makes no sense to simply abandon this underlying

constraint. Instead, it seems perfectly reasonable to expect an investigator to take

whatever practical steps he can to approximate the sort of weather events that are likely

to have caused the damage. The SGH Experts do not appear to have taken any such

steps. The court fails to see how it would have been "impractical" to simply consult

historical weather data and calibrate the spray rack tests accordingly.

### d.     Other Experts Use the Same Methodology

Plaintiffs last argue that other experts in the field use the same basic methodology

employed by the SGH Experts in this case. ECF No. 176 at 22–25. Plaintiffs emphasize

the fact that one of Pella's experts, GCI Consultants, LLC ("GCI"), used a 2/3 pressure

spray rack test to evaluate leakage at the home of named plaintiff Doug Dilly ("Dilly") in

2007, without any consideration of prior weather data. Id. at 23–24. As the court has

previously recognized, an opposing expert's endorsement of the same or similar

methodology weighs in favor of its reliability. Order at 17; see also Wise v. C.R. Bard,

Inc., 2015 WL 521202, at *10 (S.D.W. Va. Feb. 7, 2015) (noting that opposing expert

"engaged in a similar practice" in finding the challenged expert's methodology reliable).

However, the court remains convinced that this factor is not dispositive, especially in this

case, where the opposing expert employed the methodology one time, nearly 10 years

ago. At that time, AAMA 511 had not even been published, much less referenced by

ASTM E2128, so it is somewhat misleading to compare 2007 GCI tests to the SGH

Experts' testing between 2012 and 2015. Moreover, GCI's 2015 expert report (the "GCI

Report") in this case does not utilize the 2007 Dilly tests in the same way that the SGH

Experts utilize their own spray rack tests. ECF No. 129-33, GCI Expert Report. While

the GCI Report does discuss the 2007 Dilly tests, it acknowledges that the test pressures applied were based on AAMA 502-02, a performance testing standard, and therefore, did not reflect ordinary weather patterns in the area. Id. § 7.1.4. Thus, while GCI may have viewed the 2/3 pressure tests prescribed by AAMA 502-02 as an appropriate diagnostic tool in 2007, it appears to have moved away from this position by 2015. Under these circumstances, the court is simply not convinced that GCI's prior use of the 2/3 pressure tests provides strong enough evidence of reliability to disturb the court's initial ruling.

Plaintiffs' remaining evidence on this issue cannot be considered for procedural reasons. As discussed above in part III.C.1.a., plaintiffs have presented several new pieces of evidence alongside their motion to alter or amend. A number of these materials indicate that the test pressures used during the SGH Experts' spray rack tests are widely used by other industry experts. ECF No. 176-12, Schwartz Aff. ¶ 10; Whitlock Aff. ¶ 10; see also Louis Aff. ¶ (averring that "forensic investigators often use the product's performance designation to determine pressures for testing"); ECF No. 176-10, Drake Dep. 246:16–22 (indicating that 2/3 pressure tests were acceptable if the goal was to "find something new"). However, for the same reasons discussed in part III.C.1.a., the court will not consider these materials. Had plaintiffs submitted this evidence before the court issued its Order, the result might have been different, but the court cannot allow plaintiffs a second—arguably, third[10]—bite at the apple after so many of the parties' and

_____

[10] Following the hearing on Pella's motion to exclude, plaintiffs submitted a letter supplementing their arguments on certain issues discussed during the hearing. ECF No. 163. Pella argued that much of the material contained in that letter should have been disregarded as untimely. ECF No. 164. The court declined to decide the issue, concluding that Pella's motion to exclude should be granted, even if the supplemental material was considered. Order at 3.

the court's resources have been invested in evaluating the first one.  See Bey v. Shapiro Brown & Alt, LLP, 997 F. Supp. 2d 310, 321 (D. Md. 2014) ("[A] motion for reconsideration 'is not a license for a losing party's attorney to get a second bite at the apple.'" (quoting Shields v. Shetler, 120 F.R.D. 123, 126 (D. Colo. 1988)).

### 2.    Nozzle Tests

Plaintiffs offer a number of objections to the court's analysis of the SGH Experts' nozzle tests.  First, they contend that the court misunderstood the mechanics of the nozzle tests.  ECF No. 176 at 25.  Plaintiffs' then argue that the court misunderstood the purpose of the nozzle tests.  Id. at 27–32.  Finally, plaintiffs appear to contend that the nozzle tests did not subject the Windows to an unrealistic volume of water.

Plaintiffs take issue with the following description of the nozzle tests:

> [The nozzle tests] delivered an isolated stream of water to various parts of the Windows at between ≤1 and 2 psi. [] The tests directed water at the Windows' jambs, moving up the Window at a rate of 1 ft/min, until reaching the top or until water penetration was noted. [] The tests also sprayed water at the lowest pressure setting, ≤1 psi, directly onto intentionally designed gaps in the sash rain strip[] []for several minutes, or until [they] observed water on the interior face of the sash.[]

Order at 14 (internal citations omitted).  Plaintiffs state that

> [t]here is not a single gasket (rain strip) intentionally designed with gaps and head gaps are not created for drainage, but a second interior gasket that should not have gaps (as it would otherwise permit water to infiltrate into the interior of the home).  More specifically, the gaps in the gaskets at the lower corner of Pella's windows are intended to allow the passage of water by their design gaps the top are intended to achieve a pressure differential.[11]

---

[11] The court would point out that this statement is contradictory on the issue of whether any gaskets can have intentionally designed gaps, given that it explicitly recognizes that the exterior gaskets have two types of gaps.  The court would also point out that the Order never indicated the purpose of the referenced "gaps," so it is not clear why plaintiffs felt the need to correct the court in that regard.

ECF No. 176 at 25.  To the extent the court's Order mistakenly referred to the exterior gasket as a "rain strip" and failed to accurately describe the purpose of the "intentionally designed gaps" it discussed, the court apologizes for the confusion.  Nevertheless, the court thinks it is clear that it correctly understood that the Windows are designed with two gaskets—an interior gasket which should not allow <u>any</u> water intrusion and an exterior gasket that has gaps at its corners, by design.  <u>See</u> Order at 14 n. 10 ("The sash rain strip is a narrow strip of material between the sash and the frame, outboard of the frame gasket, which also serves to prevent water penetration.  Unlike the frame gasket, the rain strip has gaps at the corners to allow drainage of any water that gets past the strip.").  Plaintiffs have not otherwise contested the court's characterization of the nozzle tests.

Plaintiffs next argue that the court misunderstood the purpose of the nozzle tests in requiring the SGH Experts to replicate realistic weather events.[12]  However, plaintiffs offer seemingly conflicting accounts of what that purpose was.  At one point, they state that the nozzle tests "were designed to evaluate that if water should pass the outer gasket if there sufficient compression on the interior gaskets to prevent water intrusion."  ECF No. 176 at 25.  This statement suggests that the nozzle tests were designed to test whether the interior gaskets would fail under the sorts of conditions they would be exposed to in the course of ordinary use.  At other points, plaintiffs indicate that the nozzle tests were used <u>after</u> the SGH Experts had already concluded that the Windows were defective as a

_____

[12] Plaintiffs continue to argue that the court erred in requiring them to replicate <u>specific</u> instances in which the homeowners actually observed leakage.  ECF No. 176 at 26.  This argument has been addressed footnote 8 and does not warrant further discussion.

means of identifying the precise nature of the defect.  Id. at 26 ("The nozzle tests were implemented later in the investigation after general leakage was discovered through spray rack testing, and the nozzle was only used to isolate the precise location of a leak when visible damage was observed.").  However, there is no need to disentangle these statements because neither interpretation changes the ultimate result.  To the extent the SGH Experts used the nozzle tests to attribute the observed deterioration to defect-related leakage as opposed to some other cause, they were subject to ASTM E2128's warning not to "[t]est[] at an environmental exposure level that the building has never experienced and has little likelihood of experiencing."[13]  ASTM E2128 § 10.2.2; see also ASTM E2128 § 10.2.1 ("The service history of the building and the environmental exposure history of the site must be considered in planning a testing program. To the extent practical, the selected test method should simulate the actual conditions under which leakage has been observed.").  If, on the other hand, the nozzle tests did not contribute to the SGH Experts' opinion that the Windows' deterioration was caused by defect-related leakage, then the court need not concern itself with the nozzle tests because they do not impact the reliability of that opinion.

---

[13] The court has explained, repeatedly, why "[t]esting at an environmental exposure level that the building has never experienced and has little likelihood of experiencing," ASTM E2128 § 10.2.2, severs the logical link between the test results and the conclusion that the Windows are defective.  Plaintiffs have failed to offer any reason why this would not apply to nozzle tests.

Instead, plaintiffs suggest that the court's logic would do away with isolation testing and "diagnostic pinpointing."  ECF No. 176 at 27.  This is inaccurate.  The court has no issue with targeting water at particular parts of the Windows.  The court simply thinks it is illogical—and more importantly, contrary to the language of ASTM E2128— for an expert to observe visible deterioration, then subject a window to test conditions that place significantly more stress on the window than in-service weather conditions, and then use those test results to conclude that the window would have leaked under in-service weather conditions.

Plaintiffs also contend that the court erred in concluding that the nozzle tests subjected the Windows to unrealistic conditions. ECF No. 176 at 28–29. More specifically, plaintiffs take issue with the court's statement that "[s]praying water at a rate of nearly 23 gallons per hour directly onto the Windows for any appreciable amount of time appears highly unlikely to provide credible evidence of the Windows' performance under actual conditions." Id. (quoting Order at 16). Again, plaintiffs cite to affidavits that were not provided in the initial round of briefing, and therefore, will not be considered.[14] Id. at 28 (citing to Louis and Whitlock's affidavits). Aside from these affidavits, plaintiffs argue that because the nozzle tests did not last an hour, the court's calculation of the spray rate used during the nozzle tests was "incorrect." Id. The court would point out that while the duration of the test affects the total volume of water applied to the Windows, it has nothing to do with the rate at which the water is applied.

---

[14] Plaintiffs also note certain language in a 2015 appendix to ASTM E1105 which states that "defining the water-spray system as a replicator of a specific rain event is misleading," and that "[t]here is no evidence that the developers of Test Methods E1105, E331, and E547, intended to reproduce or simulate any given rain event." ECF No. 176-1, ASTM E1105, Appendix X1.2. In plaintiffs' view, this language makes it clear that "E1105 diagnostic testing does not require reproduction of any given weather event." ECF No. 176 at 29.

ASTM E1105 sets forth the basic procedures for performing spray rack tests, so it is unclear why plaintiffs cite this language in their discussion of the nozzle tests. Nevertheless, the court is not surprised that such language was included in ASTM E1105 given that ASTM E1105 is not a diagnostic test. Instead, ASTM E1105 "is intended primarily for determining the resistance to water penetration through such assemblies for compliance with specified performance criteria." ASTM E1105 § 1.2 (emphasis added). In fact, ASTM E1105 explicitly states that "[o]ther procedures may be appropriate to identify sources of leakage." Id. (emphasis added). This is why ASTM E2128 says "[d]iagnostic testing can [] be adapted from in-service quality assurance testing procedures such as Test Method E1105 . . ." ASTM E2128 § 10.2.7 (emphasis added). Thus, the comments in the ASTM E1105 appendix do not provide any support for the SGH Experts' use of unrealistic testing conditions in either the spray rack tests or the nozzle tests.

Moreover, the court took the 22.8 gallons per hour figure from Louis's own testimony. Louis Dep. 131:8–132:10. To the extent plaintiffs mean to suggest that describing the spray rate in gallons per hour is misleading, they have failed to explain why. Translating the figure from 22.8 gallons per hour into 0.38 gallons per minute or any other measure does nothing to the substance of the court's analysis.

More importantly, the court has yet to be convinced that this rate of water exposure is in any way realistic. Louis did suggest that water running down the side of a building in a rainstorm would present a greater volume of water than the SGH Experts used in the nozzle tests, id. at 133:10–21, but when he was pressed on the issue, he admitted that he had never done any analysis on whether it was possible for water to enter gaps in the exterior gasket at that rate.[15] Id. at 136:3–5. Additionally, as noted in the Order, Louis's suggestion that the SGH Experts intended to recreate the effect of water running down the side of the building is not particularly credible, given his testimony that the nozzle tests were designed to "generate leakage." Order at 16 n. 12. Therefore, the court sees no error in its initial conclusion that "the SGH Experts[] fail[ed] to account for actual weather conditions in conducting the nozzle tests." Id.

D. **Statistical Analysis of the SGH Experts' Sampling**

Plaintiffs next argue that the court erred in concluding that "SGH's sample size was too small and the selection was biased" because it failed to consider the "qualitative

_____

[15] It also appears that Louis did not account for the fact that the head of the Window's frame sticks out beyond the plane of the Window's sash when offering this explanation. See Louis Dep. 137:1–21 (recognizing that the amount of water running down the side of the building onto the window could be affected by the head of the window if flashing was installed, as Pella's instructions recommend).

principals of engineering." ECF No. 176 at 32. This argument misconstrues the court's Order.

The SGH Experts' basic methodology rested on the assertion that they could reliably draw conclusions about the entire population of Windows by measuring the performance of a subset of that population. In the Order, the court observed that "[t]he field of statistics provides the traditional methods for making such an assertion." Order at 19. However, the court did <u>not</u> require plaintiffs to satisfy any "extreme statistical standard," as plaintiffs now claim.[16] ECF No. 176 at 32–35. Indeed, the court expressly held open the possibility that other indicia of reliability might allow a plaintiff to satisfy <u>Daubert</u>'s requirements without any formal statistical analysis.[17] Order at 24 ("The court does not dismiss the possibility that a somewhat informal statistical analysis of the kind presented here could be found reliable if accompanied by a greater showing of reliability—i.e. evidence of acceptance in the industry, peer-reviewed literature, etc."). The court did not exclude the SGH Experts' opinions simply because they failed to present traditional evidence of statistical reliability; the court excluded the SGH Experts' opinions because plaintiffs failed to offer such evidence "<u>or otherwise explain</u> why it was sound to conclude that the performance of the Windows tested and inspected by the SGH Experts was representative of the entire universe of 7.5 million Windows." <u>Id.</u> at 21

---

[16] Plaintiffs now contend that, even if the SGH Experts were required to satisfy rigorous statistical requirements, they did so. Plaintiffs offer new evidence which purports to show that "a testing sample size of 106 in the context of 7.5 million windows renders a confidence level of [] 95% with a 7.89% margin of error." ECF No. 176 at 35. The court reiterates that it will not consider untimely evidence of this sort.

[17] While the court maintains that "convenience is not a substitute for reliability under <u>Daubert</u>," Order at 24, the court believes that its recognition that "other indicia of reliability" may substitute traditional, statistical analysis alleviates any concern that its Order imposes an impossible standard.

(emphasis added). Thus, the court's ruling was entirely consistent with the idea that "fields outside the laboratory paradigm . . . have criteria for validity that need to be met, and thus their own form of testability." ECF No. 176 at 33 (quoting Erica Beecher-Monas, The Heuristics of Intellectual Due Process: A Primer for Triers of Science, 75 N.Y.U. L. Rev. 1563, 1586 (2000)). The court simply found that plaintiffs failed to show what criteria governed the generalizability of the SGH Experts' conclusions, much less whether the SGH Experts' investigation satisfied such criteria.

Plaintiffs also argue that the court should have determined that the SGH Experts' methodology was generally accepted in the industry because Pella's experts sampled far fewer Windows before offering their opinion that "[t]he conditions of the samples of windows dissected by [Wiss, Janney, Elstner Associates, Inc. ("WJE")] and SGH do not correlate to a design defect that causes leakage paths or decay patters [as] theorized by SGH . . . ." Id. at 35 (quoting ECF No. 176-13, WJE Report Excerpt). Again, it is worth noting that an opposing expert's methodology is not dispositive of whether the challenged expert's methodology is reliable. Nevertheless, the quoted excerpt from WJE's expert report (the "WJE Report") does not even suggest that the SGH Experts' sampling was reliable because the WJE Report does not offer a conclusion about the entire population of Windows. It says only that the Windows WJE examined did not contain evidence of a design defect. Thus, WJE's opinions are distinguishable from the SGH Experts' opinions because they do not contain any inherent assertion of generalizability.

**F.      Louis's Qualifications to Opine on Wood Treatment**

Plaintiffs last argue that the court erred in concluding that Louis[18] is not qualified to offer opinions on Pella's wood treatment.[19]  ECF No. 176 at 38–41.  The SGH Report asserts that the Windows used ineffective wood treatments or ineffective wood treatment application systems, and lists a number of potential causes.  SGH Report 83–85.  In the initial round of briefing, plaintiffs argued that Louis was qualified to offer such opinions because his "37 years of experience as an engineer in the field of waterproofing design 'have provided more than sufficient expertise in the ability to identify when a wood treatment is failing prematurely.'"  Order at 28 (quoting ECF No. 135 at 28).  The court concluded that Louis's extensive experience in the field of waterproofing design qualified him as an expert in identifying wood deterioration—assuming this requires any expertise at all—but it did not permit him to testify as an expert on a number of other issues addressed by the SGH Report, such as manufacturing processes and product testing.  Id. at 30.

Plaintiffs now argue that "the [c]ourt failed to focus on Mr. Louis' core testimony in concluding he is not qualified."  ECF No. 176.  Though plaintiffs do not clarify what they consider to be Louis's "core testimony," it appears they are arguing that Louis should be allowed to testify that Pella's wood treatment is defective based on his ability to identify wood deterioration.  Id. at 39–40 (arguing that "[t]he lack of durability of the

_____

[18] All parties agree that the SGH Experts' qualifications turn on Louis's qualifications.

[19] Plaintiffs also recognized that the court excluded the wood treatment opinions based on its concern about the sufficiency of the SGH Experts' sampling.  Plaintiffs simply incorporate the arguments addressed in part III.D. on this point.  Because the court has rejected those arguments, the court would not reconsider its ruling, even if it found that it erred in evaluating Louis's qualifications.

windows themselves provides evidence that the treatment is ineffective," and asserting that "Louis should be able to testify that the windows were deteriorating prior to their expected service life"). Plaintiffs point out that "[t]he standards are clear that a window should last 20–25 years" and "Pella's wood science expert [has substantiated] that the intended purpose of wood preservative is to prevent the wood from deteriorating." Id. Plaintiffs then argue that, because these facts are well established, Louis should be able to testify that Pella's wood treatment is defective because he has observed deterioration on the Windows within their expected service life.[20]

This logic is simple enough. So simple, in fact, that plaintiffs assert that "one does not need to be an expert in car tire fabrication to know that a tire rated for 55,000–60,000 miles of service use that loses its tread in 13,000–14,000 miles indicates premature failure." ECF No. 176 at 40. Of course, when this logic is transposed onto the facts of this case, it reads as follows: "One does not need to be an expert in wood treatments to know that a wood treatment that is supposed to last for 20–25 years that allows wood deterioration in 6–10 years indicates premature failure." This raises the question of whether Louis's proposed testimony is expert testimony at all. Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993) (recognizing that an expert's testimony must be "helpful" to the trier of fact and explaining that "[t]estimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror"). The court would not be particularly concerned if Louis wished to simply

---

[20] The court would also note that this stripped down version of Louis's opinion does not comport with what was proposed when Pella's motion to exclude was initially argued, when plaintiffs argued that Louis was qualified to offer opinions on Pella's manufacturing processes and product testing based on his experience with the IS-4 industry standards for wood treatment performance. ECF No. 162, H'rg Tr. 77:3–19.

testify that he observed wood deterioration on the Windows. But it is evident that Louis wishes to go further, and explain to the jury that this deterioration evinces a defect in the wood treatment using the logic outlined above. Perhaps it is true that, on some level, Louis's defect opinion still "employs" his expertise in identifying wood deterioration, inasmuch as it is based on observations obtained through the use of that expertise. Id. ("The subject matter of Rule 702 testimony need not be arcane or even especially difficult to comprehend. If, again in the disjunctive, the proposed testimony will recount or employ 'scientific, technical, or other specialized knowledge,' it is a proper subject."). However, the Fourth Circuit has explained that the line "between the 'specialized knowledge' that is admissible under [Rule 702] and the 'common knowledge' that is not . . . is defined by helpfulness." Id. Because plaintiffs have effectively admitted that the jury does not need Louis's "expertise" to understand this connection, the court fails to see how Louis's opinion on the subject would be "helpful" to the jury. Therefore, the court concludes that Louis should not be permitted to opine that Pella used defective wood treatments or defective wood treatment application processes.

## IV.   CONCLUSION

For the foregoing reasons, the court **DENIES** plaintiffs' motion to alter or amend.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 24, 2017**
**Charleston, South Carolina**